# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————

No. 13-30887

——————

United States Court of Appeals
Fifth Circuit

**FILED**
September 10, 2014

Lyle W. Cayce
Clerk

CHEMTECH ROYALTY ASSOCIATES, L.P.,
As Tax Matters Partner Real Party in Interest Dow Europe, S.A.,

Plaintiff–Appellant Cross-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant–Appellee Cross-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

CHEMTECH ROYALTY ASSOCIATES, L.P.,
by Dow Europe, S.A. as Tax Matters Partner,

Plaintiff–Appellant Cross-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant–Appellee Cross-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 13-30887

CHEMTECH II, L.P.,

Plaintiff–Appellant Cross-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant–Appellee Cross-Appellant.

* * * * * * * * * * * * * *

CHEMTECH II, L.P. BY IFCO, INCORPORATED, as Tax Matters Partner,

Plaintiff–Appellant Cross-Appellee,

versus

UNITED STATES OF AMERICA,

Defendant–Appellee Cross-Appellant.

—————————

Appeals from the United States District Court
for the Middle District of Louisiana

—————————

Before DAVIS, SMITH, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal concerns the tax consequences of two transactions

2

No. 13-30887

undertaken by Dow Chemical Company ("Dow") and a number of foreign banks[1] from 1993 through 2006. During those years, Dow and the foreign banks purported to operate two partnerships that generated over one billion dollars in tax deductions for Dow. After a five-day trial, the district court disregarded the partnerships for tax purposes on three grounds: (1) The partnerships were shams; (2) the transactions lacked economic substance; and (3) the banks' interests in Chemtech Royalty Associates, L.P. ("Chemtech"), were debt, not equity. The court also imposed substantial understatement and negligence penalties but refused to impose substantial-valuation or gross-valuation misstatement penalties. Because, under these specific facts, the court did not clearly err in holding that Dow lacked the intent to share the profits and losses with the foreign banks, we affirm its sham-partnership holding. In light of *United States v. Woods*, 134 S. Ct. 557 (2013), however, we vacate and remand as to the penalty award.

I.

In the early 1990s, Goldman Sachs developed a financial product called Special Limited Investment Partnerships ("SLIPs"), which it promoted as a tax shelter. A series of steps typically had to be executed to create this type of product. First, the American corporation had to identify a valuable group of assets with a tax basis[2] at or near zero. Second, the corporation needed to

---

[1] Bank of Brussels Lambert, Dresdner Bank A.G., Kredietbank N.V., National Westminster Bank plc, and Rabo Mercent Bank N.V. (collectively, "the foreign banks").

[2] Basis generally refers to the amount of capital investment in a property for tax purposes. Ordinarily, an asset's basis is its cost. Tax basis may be reduced by allowances for depreciation or amortization (which would then be referred to as the adjusted tax basis). Adjusted tax basis may be used to recognize that an asset gained or lost money when determining tax liability from a taxable event. An adjusted tax basis cannot generally be lower than zero.

create or designate subsidiaries through which it would participate in the transaction. Those subsidiaries would then contribute the assets to the partnership. Third, the corporation had to entice foreign entities to participate in the transaction. The tax benefits generated by the partnership could be attained only if the partnership's income could be assigned to a tax-indifferent party. Fourth, the parties would need to enter into various agreements that would govern the transaction.[3] In 1992, Dow decided to pursue this transaction, endeavoring to create an asset-backed equity financing vehicle.

Following these steps, Dow selected 73 patents to contribute to the partnership. The district court found that Dow did not select "patents that would be attractive to a third party." Instead, it contributed those patents that (1) "had the highest value (in order to reduce the total number of patents)," (2) had a zero or near zero tax basis, and (3) were actively used by one of Dow's businesses. For most patents, Dow "did not contribute all technology that would have been necessary for third party licensees," requiring a potential third-party licensee to obtain licenses from both the partnership and Dow. In line with these findings, Dow selected patents valued at roughly $867 million, with 71 of the 73 patents having zero tax basis.[4]

Next, Dow created two domestic subsidiaries—Diamond Technology Partnership Co. ("DTPC") and Ifco, Inc. ("Ifco")—and used a wholly-owned foreign subsidiary—Dow Europe, S.A. ("DESA")—to carry out this transaction. Through these subsidiaries, Dow formed Chemtech as a Delaware limited partnership with its principal place of business in Switzerland.[5] Again through

---

[3] Usually, the entity would need to lease the assets back to the corporation, so that the corporation could continue to use the asset, which would in turn provide the partnership with its primary source of revenue.

[4] The other two patents had a combined tax basis of approximately $54,000.

[5] Before the foreign banks entered the transaction, Chemtech was owned 89% by

these subsidiaries, Dow contributed to Chemtech I[6] the identified 73 patents, $110 million, and all of the stock of Chemtech Portfolio, Inc. ("CPI"), a pre-existing shell corporation owned by Dow.

Five foreign banks decided to participate as limited partners in Chemtech, investing a total of $200 million in the partnership. The entry of the foreign banks forced Ifco's partnership share to be retired. By October 1993, Chemtech was owned 1% by DESA (the general partner), 81% by DTPC, and 18% by the foreign banks.

Finally, Dow and the foreign banks entered into various agreements to govern the transaction, including a patent license agreement, a partnership agreement, and various indemnity agreements. The patent license agreement allowed Dow to continue to use the patents contributed to Chemtech. Under that agreement, Dow bore responsibility for all costs related to the patents and paid a royalty to Chemtech, regardless of Dow's use of the patents. Chemtech did not change Dow's use of its patents. The partnership agreement, in relevant part, (1) required the maintenance of capital accounts for each partner,[7] (2) governed the allocation of profits and losses among the partners,[8] (3) limited the types of assets the partnership could hold,[9] (4) included the conditions that

---

DTPC, 10% by Ifco, and 1% by DESA, which was the general partner.

[6] Dow entered into two transactions with the foreign banks. We refer to the first transaction as Chemtech I and the second as Chemtech II. We refer to both jointly as the Chemtech transactions.

[7] The agreement required Chemtech to maintain assets worth 3.5 times the unrecovered capital contributions of the foreign bank.

[8] The partnership agreement entitled the foreign banks to 99% of Chemtech's profits until they received their "annual 'priority return'" of 6.947% on their contributions. If Chemtech generated sufficient profits in a given quarter, it was required to pay the full priority return to the foreign banks. Even if profits for that quarter were insufficient, Chemtech was still required to pay 97% of the priority return.

[9] Chemtech could hold only the following assets: the patents, the chemical plant, and the stock of CPI. CPI, in turn, was required to hold a minimum of $50 million and was

triggered the right to liquidate the partnership,[10] and (5) provided the manner in which assets would be allocated on liquidation.[11]  Finally, because the foreign banks conditioned their willingness to participate in Chemtech on being indemnified against any liability arising from the assets or any tax liability, Dow indemnified them against those risks.

Chemtech I operated from April 1993 through June 1998, during which time Dow's royalty payments served as Chemtech's primary source of income, totaling $646 million.  Because Chemtech claimed $476.1 million of book depreciation on the patents contributed to it, it reported book profits[12] of only $61.7 million,[13] out of which it paid (1) the 6.947% priority return to the foreign banks, (2) a 1% distribution to DESA, and (3) a relatively small distribution to each partner to pay its Swiss tax obligation.  Chemtech then contributed the

---

permitted to own only cash equivalents, very low-risk securities, Dow loans, and Dow demand notes.

[10] Section 14.1 of the partnership agreement lists twenty-three possible conditions that could trigger the parties' right to liquidate the partnership.  To name a few: (a) "The General Partner or Dow shall . . . fail to perform . . . any material term, covenant or obligation required . . . under this Agreement, the Dow Liquidator Guaranty, the Supplemental Dow Indemnity, or the Dow Limited Partner Guaranty . . . ."; (b) "The General Partner, Dow, DTPC or Ifco shall fail to perform . . . any material term, covenant or obligation required . . . under the License Agreement, the Master Lease, the Investment Agreements, or the Contribution Agreement . . . ."; (e) "April 6, 2000 shall occur."; (f) "The Partnership shall fail to distribute to the [foreign banks] in immediately available funds on the last Business Day of any Fiscal Quarter an amount equal to the product of (i) ninety-seven percent (97%) times (ii) the amount described in section 4.2(a)(i) with respect to such Fiscal Quarter."; (g) "The Partnership or the Partnership Subsidiary shall fail to satisfy any of the Portfolio Requirements . . . ."

[11] Upon liquidation, the foreign banks would receive the balance of their capital accounts (effectively their initial investment), plus 1% of any gain or less 1% of any loss resulting from a change in the value of Chemtech's assets.  Liquidation provisions compensated the foreign banks for a shortfall in their expected return if Chemtech were terminated before seven years.

[12] Book profit refers to a gain of an investment that has not yet been realized but exists for accounting purposes.

[13] Chemtech's other expenses included management fees to DESA and a guaranteed payment to DTPC.

6

remaining cash to CPI, which loaned the bulk of the cash to Dow. Chemtech allocated the overwhelming majority of its income to the foreign banks and only a fraction of its income to Dow. As the district court observed, "[w]hile Dow claimed royalty expense deductions for the money flowing *to* Chemtech, it did not take into account the income of the bulk of the money flowing *from* Chemtech."[14]

In December 1997, DESA informed the foreign banks that new tax regulations could potentially subject the banks' priority return to a 30% withholding tax for which Dow would be responsible under the tax indemnity. In February 1998, Dow terminated Chemtech I. The foreign banks received the sum of their capital account balances, the early liquidation amounts, 1% of the increase in value of the contributed patents, and the priority return for one month. Ifco also bought out DESA's interest as general partner.

Shortly after terminating Chemtech I, Dow began planning a similar transaction that would operate essentially the same way. Dow again sought to identify a high-value, low tax basis asset to contribute to Chemtech II. Dow decided to use one of its Louisiana chemical plants. The chemical plant was valued at $715 million but had a tax basis of only about $18.5 million.

As in Chemtech I, Dow utilized a subsidiary to participate in the transaction—this time Dow Chemical Delaware Corporation ("DCDC"). In June 1998, DCDC contributed the chemical plant and all of the stock of a shell subsidiary, Chemtech Portfolio Inc. II ("CPI II"), to Chemtech II. Dow entered into a lease with Chemtech II for continued use of the chemical plant. Under

---

[14] The 1994 cash flows are illustrative: (1) Dow made a royalty payment to Chemtech for $143.3 million; (2) Chemtech distributed $13.9 million to the foreign banks, as their priority return; and (3) Chemtech, through CPI, loaned $136.9 back to Dow. That year, Dow deducted $143.3 million in royalty expenses. Chemtech had a taxable income of $122.4 million for 1994, allocating $115 million of that income to the foreign banks and $28.1 million to Dow. The district court's order details similar cash flows for 1995, 1996, and 1997.

No. 13-30887

the lease, Dow remained responsible for all expenses associated with the plant and was required to pay rent regardless of its use of the plant. As with the patents in Chemtech I, Chemtech II did not change Dow's use of the chemical plant. During the transition from Chemtech I to Chemtech II, Dow retired DTPC as a partner.[15]

In June 1998, RBDC, Inc. ("RBDC"), a U.S. affiliate of Rabo Mercent Bank N.V, purchased a limited interest in Chemtech II for $200 million. Rabo Mercent Bank N.V was one of the foreign banks that invested in Chemtech I. At this point, Chemtech II was owned 6.37% by Ifco, 20.45% by RBDC, and 73.18% by DCDC. Ifco served as the general partner and RBDC and DCDC served as limited partners. Chemtech II operated similarly to Chemtech I: (1) Dow entered into similar agreements with substantially similar terms; (2) the cash flows displayed similar patterns;[16] and (3) Dow enjoyed substantial tax savings through a similar but not identical mechanism.[17]

Chemtech II's partnership agreement permitted RBDC to elect to liquidate its interest in March 2003. At that time, Dow and RBDC negotiated a new partnership agreement that reduced RBDC's priority return to 4.207%. Dow and RBDC continued to operate Chemtech II through June 2008.

---

[15] DTPC liquidated its interest in Chemtech in exchange for the patent portfolio, $4.5 million in cash, and a 70% interest in CPI. Shortly before this liquidation, CPI exchanged its holdings of $700 million in demand notes for a deeply subordinated note payable in 33 years. Dow avers that "that exchange was performed to eliminate any potential uncertainty over whether [DTPC]'s CPI interest would be treated as a taxable 'marketable security' under the distribution rules in 26 U.S.C. § 731."

[16] Each year, after paying a 6.375% priority return to RBDC and a $400,000 management fee to Ifco, Chemtech II contributed its excess cash to CPI II, which in turn loaned the funds to Dow. From 1998 through 2003, CPI II loaned a total of $356.5 million to Dow.

[17] Dow paid rent to Chemtech II and claimed deductions for that rent. Though Chemtech II allocated most of that rental income to DCDC and Ifco, the chemical plant's stepped-up basis allowed Dow to offset that increase in income with depreciation deductions that were also allocated to DCDC and Ifco.

No. 13-30887

The Internal Revenue Service ("IRS") issued Chemtech Final Partnership Administrative Adjustments ("FPAAs") for tax years 1993 through 2006. It also asserted accuracy-related penalties under I.R.C. § 6662 for 1997 through 2006. Dow sued to contest the FPAAs. After a five-day trial, the court disregarded the partnership for tax purposes on three grounds: (1) The partnerships were shams; (2) the transactions lacked economic substance; and (3) the banks' interests in Chemtech were debt, not equity.[18] The court also assessed a twenty-percent penalty for each of the relevant tax years, awarding substantial-understatement and negligence penalties. The court, however, believed it could not impose a gross-valuation misstatement penalty.

As to its sham partnership holding, the court found that Dow lacked both the intent to act in good faith for some genuine business purpose other than tax avoidance and the intent to share profits and losses with the foreign banks. As to the second intent, the court found that "[t]he foreign banks were not true partners" because "the banks were [essentially] guaranteed a return just under 7% each year" and "[a] valid partnership is not formed where, among other things, one partner receives a guaranteed, specific return."

On appeal, Dow avers that the district court erred in finding the partnerships to be shams. Because Dow believes the foreign banks' interest cannot be classified as debt under *United States v. South Georgia Railway Co.*, 107 F.2d 3 (5th Cir. 1939), it claims that it must have provided the foreign banks with equity in Chemtech. It reasons that because the foreign banks received equity, Dow entered into a valid tax partnership, regardless of any other criteria. As to the penalty award, Dow concedes that the court erred in foreclosing the

---

[18] For the reasons we detail below, we affirm the sham-partnership holding. We therefore do not address whether the court erred in (1) determining the transactions lacked economic substance or (2) classifying the transactions as debt. Accordingly, we do not address the parties' arguments relating to these conclusions by the district court.

No. 13-30887

availability of a gross-valuation misstatement penalty.[19]

The government contends, for three reasons, that Dow did not intend to share the profits or losses with the foreign banks:  First, the agreement allocated essentially all of the risk-bearing to Dow.  "The banks [ ] insisted that they bear no liability"—product, tax, or any other type—"for the patents or the chemical plant."  Second, "[t]he banks did not have bona fide equity interests in Chemtech."  And third, "[t]he evidence is [ ] clear that the banks did not view themselves as joining with Dow to manage such assets."

## II.

"The starting point for our analysis is the cardinal principle of income taxation:  A transaction's tax consequences depend on its substance, not its form."  *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 478−79 (5th Cir. 2011).  That maxim "is the cornerstone of sound taxation."  *Estate of Weinert v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961).  "'Tax law deals in economic realities, not legal abstractions.'"  *Id.* (quoting *Comm'r v. Sw. Exploration Co.*, 350 U.S. 308, 315 (1956)).  "This foundational principle finds its voice in the judicial anti-abuse doctrines, which prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit."  *Southgate,* 659 F.3d at 479 (internal quotation marks omitted).

A taxpayer may not be able to claim the "tax benefits of a transaction—even a transaction that formally complies with the black-letter provisions of

---

[19] Dow concedes this point in its reply brief:  "Appellants agree with the Government that if the district court's holding on the merits is sustained (which it should not be), the district court decision on the 40 percent substantial valuation misstatement penalty should be remanded in light of . . . *United States v. Woods*, 134 S. Ct. 557 (2013)."

the Code and its implementing regulations—if the taxpayer cannot establish that 'what was done, apart from the tax motive, was the thing which the statute intended.'" *Id.* (quoting *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)). "Because so many abusive tax-avoidance schemes are designed to exploit the Code's partnership provisions, our scrutiny of a taxpayer's choice to use the partnership form is especially stringent." *Id.* at 483–84 (footnote omitted).

"In an appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo." *Id.* at 480. "Specifically, a district court's characterization of a transaction for tax purposes is a question of law subject to de novo review, but the particular facts from which that characterization is made are reviewed for clear error." *Id.* (internal quotation marks omitted). "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole," *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009) (internal quotation marks omitted), or so long as this court has not been "left with the definite and firm conviction that a mistake has been made," *Streber v. Comm'r*, 138 F.3d 216, 219 (5th Cir. 1998).

III.

A partnership "may be disregarded [for tax purposes] where it is a sham or unreal."[20] In order not to be a sham, or to be a valid partnership for tax purposes, "persons [must] join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and [ ] there [must be a] community of interest in the profits and losses." *Comm'r v. Tower*, 327

---

[20] *Moline Props., Inc. v. Comm'r*, 319 U.S. 436, 439 (1943) ("In such situations the form is a bald and mischievous fiction.").

U.S. 280, 286 (1946).[21]  This court has recently reaffirmed the test announced in *Tower* and repeated in *Culbertson*:  "As the Supreme Court [has] explained . . . , whether a partnership will be respected for tax purposes depends on whether the parties in good faith and acting with a business purpose genuinely intended to join together for the purpose of carrying on the business and sharing in the profits and losses."  *Southgate*, 659 F.3d at 483 (internal quotation marks omitted).  "The fact that a partnership's underlying business activities had economic substance does not, standing alone, immunize the partnership from judicial scrutiny."  *Id.* at 484.

As *Tower*, *Culbertson,* and *Southgate* demonstrate, the parties, to form a valid tax partnership, must have two separate intents: (1) the intent to act in good faith for some genuine business purpose and (2) the intent to be partners, demonstrated by an intent to share "the profits and losses."  If the parties lack either intent, then no valid tax partnership has been formed.  To determine whether the parties had these intents, a court must consider "all the relevant facts and circumstances," including (a) "the agreement," (b) "the conduct of the parties in execution of its provisions," (c) the parties' statements, (d) "the testimony of disinterested persons," (e) "the relationship of the parties," (f) the parties' "respective abilities and capital contributions," (g) "the actual control of income and the purposes for which it is used," and (h) "any other facts throwing light on their true intent."  *Id.* at 483 (internal quotation marks omitted).  Consistent with these directives, we limit our consideration and decision here to the specific facts and transactions that are presented.

*Southgate* relied on *TIFD III–E, Inc. v. United States (Castle Harbour II),*

---

[21] *See also Comm'r v. Culbertson*, 337 U.S. 733, 740 (1949) ("[In *Tower*], [w]e [ ] said that a partnership is created 'when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses.'").

459 F.3d 220 (2d Cir. 2006), which involved a scheme very similar to the one involved in this case. There, acting through various subsidiaries, General Electric Capital Corporation ("GECC") formed a partnership with two Dutch banks. Both GECC and the banks contributed assets to the partnership.[22] Although "the Dutch banks[ ] contributed about 18% of the partnership's capital and [ ] nothing to its management, [they] were allocated . . . 98% of most of its taxable income." *Id.* at 227. The banks' actual receipts, however, were much smaller: "[T]he reimbursement of their investment, plus an annual return at an agreed rate near 9%, plus a small share in any unexpectedly large profits," which was capped at less than 2.5% of the banks' investment. *Id.* at 227, 229. In response to the IRS's issuance of two FPAAs, GECC sued to challenge their validity. The district court found that the transactions had economic substance and that Castle Harbour was a valid tax partnership.

The Second Circuit reversed, determining "that the Dutch banks [were not] equity partners in the Castle Harbour partnership because they had no meaningful stake in the success or failure of the partnership." *Id.* at 224. The Dutch banks neither shared in the profits nor the losses. "As a practical matter," GECC capped "the Dutch banks' opportunity to participate in unexpected and extraordinary profits (beyond the reimbursement of their investment at the Applicable Rate of return) . . . ." *Id.* at 235.[23] And second, the Dutch banks

---

[22] "The assets transferred by GECC entities to the partnership were the fleet of aircraft, with a market value of $272 million, $22 million in receivables from aircraft-rental agreements, and $296 million in cash, making a total investment of $590 million. Shortly thereafter, the two Dutch banks contributed $117.5 million in cash to the partnership." *Castle Harbour II*, 459 F.3d at 225.

[23] *See also id.* at 234–35 ("First, the taxpayer [ ] held the full power to manage the partnership, [which gave it] the right . . . to reclassify the income produced . . . from . . . Operating Income (in which the banks would take 98%) to Disposition Gains (in which the banks' share was 1%, over and above approximately $2.85 million). Second, the taxpayer could reduce drastically the net Operating Income . . . by redepreciating the already fully depreciated aircraft, which had the effect of transferring the revenue covered by the

faced no meaningful risk of loss: "[F]eatures of the Castle Harbour agreements combined to provide the Dutch banks with not only a reasonable expectation, but an ironclad assurance that they would receive repayment of their principal at the Applicable Rate of return, regardless of the success of the Castle Harbour venture." *Id.* at 239–40.[24]

In *Castle Harbour II*, in conducting the sham-partnership inquiry, the Second Circuit considered it *helpful* first to address whether the interest has "the prevailing character of debt or equity." *Id.* at 232.[25] Dow insists that we *must* first determine whether an interest qualifies as debt or equity before we can address whether there is a sham partnership under *Culbertson*. To support that proposition, Dow points to *South Georgia Railway*, which it believes demonstrates that debt requires (1) a fixed maturity date on which fixed amounts are due and (2) a holder's legal right to enforcement in the event of default. The reasoning continues that the foreign banks were not legally entitled to repayment of their investment even if the banks could recover the value of their partnership share when terminating the partnership. Therefore, Dow avers that the parties must have held equity in Chemtech and must have been

---

depreciation from the banks to the taxpayer. Finally, the taxpayer could at any time, and at negligible cost, terminate the partnership." (footnote omitted)).

[24] *See also id.* at 240 ("These features included (a) the Exhibit E payment schedules; (b) the Investment Accounts; (c) the Class A Guaranteed Payments; (d) the requirement for the benefit of the Dutch banks that CHLI maintain Core Financial Assets of 110% of the obligation owed to the Dutch banks; (e) the banks' ability to liquidate the partnership in certain circumstances and receive reimbursement at the Applicable Rate of return; (f) the $300 million worth of casualty-loss insurance, which was obtained by Castle Harbour for the benefit of the Dutch banks; and, most importantly, (g) GECC's personal guaranty of the obligations owed by the partnership to the Dutch banks.").

[25] *Castle Harbour II* considered an interest to have the prevailing character of debt if "the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or . . . the risk of the business." *Id.* at 233 (internal quotation marks omitted). For the reasons we discuss below, it is not helpful in this case to classify an interest as debt or equity before conducting the *Culbertson* inquiry.

valid tax partners under *Culbertson* regardless of what else the record may demonstrate.

Dow's argument fails. First, it has not identified any precedent that *requires* us to (a) classify an interest as debt or equity before conducting the *Culbertson* inquiry and (b) find a valid partnership solely because the parties did not have a legal right to demand repayment of their principal investment on any fixed future date. Even assuming that *South Georgia Railway* correctly describes when we must classify an interest as debt,[26] that case does not have any bearing on the sham-partnership inquiry. *Southgate* certainly did not rely on *South Georgia Railway* in any respect.[27]

Second, such a requirement would run afoul of *Culbertson* and *Southgate*. In essence, Dow wants us to limit our sham-partnership inquiry to two considerations: whether the parties executed a legal document expressly (1) allowing the foreign banks to demand repayment of their principal investment (as opposed to the value of their partnership share) and (2) specifying a fixed date on which they could do so. Even further assuming Dow can demonstrate the transactions lacked one of these criteria,[28] *Southgate* does not

---

[26] The government challenges whether *South Georgia Railway* provides the governing test, pointing us to *Plantation Patterns, Inc. v. Commissioner*, 462 F.2d 712 (5th Cir. 1972). We do not express any opinion as to what the proper test is for determining whether an interest constitutes debt or equity.

[27] *See Southgate*, 659 F.3d at 485 ("In this case, an application of *Culbertson*'s totality-of-the-facts-and-circumstances test demonstrates that the Southgate partnership was a sham that need not be respected for tax purposes.").

[28] Even assuming *arguendo* Dow has correctly stated the law, the government disputes Dow's characterization of the facts. The government claims that the foreign banks could (1) opt to liquidate the interest by the passage of April 6, 2000 (the seven-year anniversary of Chemtech), and (2) receive back their capital accounts and any undistributed interest payment on that date. Therefore, the government asserts that, as a matter of practical reality, the foreign banks did have the right to demand repayment of their investment on a fixed date. We take no position, for purposes of classifying this interest as debt instead of equity, on whether in fact the foreign banks had creditor rights.

15

No. 13-30887

restrict our inquiry in that manner. "The *sine qua non* of a partnership is an intent to join together for the purpose of sharing in the profits and losses of a genuine business." *Southgate*, 659 F.3d at 488. Accepting Dow's suggestion would require us to elevate the transaction's form over its substance, contrary to long-standing doctrine.

Therefore, in assessing whether the district court erred in its sham-partnership holding, we express no opinion as to whether the interests should be classified as debt. Instead, we limit our inquiry to whether Dow possessed the intent to be partners with the foreign banks, focusing on whether Dow had the intent to share the profits and losses with the foreign banks. To make this determination, we consider all relevant "facts throwing light on their true intent," *id.* at 484 (quoting *Culbertson*, 337 U.S. at 742), and review only for clear error, *id.* at 480.[29]

## IV.

As we explain, we consider the court's finding on both the intent to share profits and the intent to share losses to be plausible in light of the record as a whole and therefore not clear error. First, the transactions were structured to ensure that Dow paid the foreign banks a fixed annual return on their investment "regardless of the success of the [Chemtech] venture," just as in the transaction in *Castle Harbour II*. The agreement entitled the foreign banks to 99% of Chemtech's profits until the banks received the priority return, but only 1% after that. Even if Chemtech did not generate sufficient profits to pay the

---

[29] *See Southgate*, 659 F.3d at 487 n.68 ("The district court's conclusion that [a partner] had no intention of allowing the other partners to share in the [property contributed to the partnership] was necessarily a finding of fact. . . . [T]he question of intent [is] the quintessential factual question." (citations and internal quotation marks omitted)).

return, itself a highly unlikely situation,[30] the foreign banks were still entitled to 97% of the priority return. Moreover, the banks received compensation even if the partnership did not last the length anticipated by the parties, again demonstrating that the banks were compensated regardless of profitability. Dow even insulated the banks from bearing transactional costs incurred by participating in Chemtech.[31]

Second, Dow agreed to bear all of the non-insignificant risks arising out of the Chemtech transactions, which further shows that the parties did not intend to share any possible losses. The transaction created only three possible sources of loss: (1) tax liability, (2) liability arising from ownership of the patents or chemical plant, and (3) loss of the banks' initial investment. Dow has not identified any other possible source of loss. Because Dow indemnified the foreign banks for any liability arising from the patents and the chemical plant and for any tax liability, Dow did not intend to share that risk with the foreign banks. In fact, the foreign banks would not have participated in Chemtech if they had to bear any of that risk.

Furthermore, just as in *Castle Harbour II*, the agreement included four significant "ironclad" assurances to ensure that Dow would not misappropriate or otherwise lose the banks' initial investment: One, requiring Chemtech to hold 3.5 times the unrecovered capital contributions of the bank, ensured that if anything happened, the banks would be able to get back their money. Two,

---

[30] As a practical matter, payment of less than the full priority return was highly unlikely because (i) the minimum royalty payments from Dow sufficiently funded the priority return, and (ii) Chemtech could not incur more than $1 million in annual expenses without the banks' approval.

[31] For example, Dow compensated the foreign banks for any expenses they might owe to other lending institutions that insured or financed their contributions to Chemtech. Dow also indemnified the foreign banks for any liabilities attributable to Chemtech's pre-registration and winding-up activities.

by severely limiting the assets Chemtech could hold, the agreement again minimized the possibility that the foreign banks would lose their initial investment. Three, in light of all of the possible voluntary conditions that triggered the right to terminate, if the banks perceived any risk to their investment, the agreement allowed the banks to terminate the partnership and recoup *effectively* their full initial investment with minimal transaction costs. Four, Dow guaranteed that its subsidiaries would perform their obligations under the various agreements. All of these features worked together to ensure that the foreign banks faced effectively no risk to their initial capital investment or to their priority return.

Third, just as in *Castle Harbour II*, the foreign banks did not meaningfully share in any potential upside. The possibility that the foreign banks could possibly obtain a fraction of residual profits does not make the finding on intent clearly erroneous. This is true because residual profits were possible only if a patent portfolio performed well enough to trigger Dow's obligation to pay variable royalties. Dow, however, does not contend—and nothing in the record suggests—that Dow or the foreign banks expected the contributed patents to increase in value. In fact, Dow does not even claim that it created Chemtech for the purpose of managing its patents. The parties could not have intended to share profits through a means no one expected or designed to be profitable. Even assuming *arguendo* (a) the intent to share profits can be demonstrated in a way not contemplated to be profitable at the time of the agreement, or (b) Dow and the foreign banks believed the patents would increase in value, we would still not consider the district court's finding clearly erroneous. The agreement (a) allocated only 1% of the increased value of a given patent portfolio to all of the foreign banks *collectively* and (b) allowed Dow effectively to control Chemtech's ability to earn such additional profits by giving Dow the ability to remove profitable patents.

No. 13-30887

All of these considerations demonstrate that the district court did not clearly err in determining that Dow lacked the intent to share the profits and losses of the Chemtech transactions with the foreign banks. We therefore affirm the district court's sham partnership holding and do not reach its economic substance holding or its holding classifying the interest as debt.

V.

Section 6662 of the Internal Revenue Code imposes a twenty-percent penalty to "the portion of any underpayment which is attributable to 1 or more of the following: (1) [n]egligence or disregard of rules or regulations[,] (2) [a]ny substantial understatement of income tax[, or] (3) [a]ny substantial valuation misstatement under chapter 1 . . . ." 26 U.S.C. § 6662(a), (b)(1)–(3). The Code increases the penalty to forty percent of the underpayment for a "gross" valuation misstatement.[32] *Id.* § 6662(h). The Code does not allow penalties to be stacked, even if more than one penalty applies.[33]

The district court imposed twenty-percent penalties for negligence and substantial understatement but declined to impose either the substantial-valuation or gross-valuation misstatement penalties. The court believed that it could not impose a valuation-misstatement penalty when an entire transaction had been disregarded (here under the economic substance doctrine). The

---

[32] A substantial-valuation misstatement occurs if "the value of any property (or the adjusted basis of any property) claimed on any return of tax . . . is 150 percent or more of the amount determined to be the correct amount . . . ." 26 U.S.C. § 6662(e)(1)(A). A gross-valuation misstatement occurs if the claimed value of any property is 200% or more than the determined correct amount. *See id.* § 6662(h)(2)(A)(i).

[33] *See* 26 C.F.R. 1.6662-2(c) ("The maximum accuracy-related penalty . . . may not exceed 20 percent of such portion (40 percent of the portion attributable to a gross valuation misstatement), notwithstanding that such portion is attributable to more than one of the types of misconduct described in paragraph (a) of this section.").

19

court relied on *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990).[34]

After the district court issued its order, the Supreme Court decided *United States v. Woods*, 134 S. Ct. 557 (2013), which rejects the *Heasley* rule:

> Woods' primary argument is that the economic-substance determination did not result in a "valuation misstatement." He asserts that the statutory terms "value" and "valuation" connote "a factual—rather than legal—concept," and that the penalty therefore applies only to factual misrepresentations about an asset's worth or cost, not to misrepresentations that rest on legal errors (like the use of a sham partnership).
>
> We are not convinced. . . . The statute contains no indication that the misapplication of one of those legal rules cannot trigger the penalty.

*Id.* at 566. Therefore, the district court erred in foreclosing the applicability of both the substantial-valuation and gross-valuation misstatement penalties. We remand for the court to determine whether to impose either or both of those penalties. We express no opinion on whether the court erred in imposing the negligence and substantial-understatement penalties. On remand, the court should consider the extent to which imposing those penalties remains consistent with this opinion.

The judgment is AFFIRMED in part and VACATED and REMANDED in part. In so deciding, we limit our reasoning to the specific facts and transactions at hand.

---

[34] *Heasley*, 902 F.2d at 383 ("Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.").