# United States Tax Court

T.C. Memo. 2024-50

PICCIRC, LLC, PIMLICO, LLC, A PARTNER OTHER THAN THE
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 4308-12.                                  Filed April 22, 2024.

————

*Donald M. Lund*, *Michael A. Metcalfe*, *Gabriel G. Tsui*, and *Steven Gary Chill*, for petitioner.

*Thomas J. Kerrigan*, *Andrew K. Lee*, *Theodore Robert Leighton*, and *Joshua Nachman*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: This case is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, § 402(a), 96 Stat. 324, 648.[1]  In a notice of final partnership administrative adjustment (FPAA), respondent disallowed a $22,718,351 ordinary loss deduction that PICCIRC, LLC (PICCIRC), claimed on its 2002 Form

---

[1] Before its repeal for taxable years beginning after December 31, 2017, TEFRA, codified at sections 6221 through 6234, prescribed procedures for audit and litigation concerning returns filed by partnerships.  Respondent followed these procedures in this case.  Unless otherwise indicated, statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[*2] 1065, U.S. Return of Partnership Income, in connection with the sale of distressed Brazilian trade receivables. Respondent adjusted the partnership's basis in the receivables to zero and determined that accuracy-related penalties under section 6662 applied to any underpayments of tax attributable to the disallowance. PIMLICO, LLC (PIMLICO or petitioner), a partner other than the tax matters partner of PICCIRC, timely filed a Petition for review under section 6226. We sustain respondent's determinations concerning the loss deductions and penalties, as set forth below.

FINDINGS OF FACT

Some of the facts are stipulated and are so found. The Stipulation of Facts and its Exhibits are incorporated herein by this reference. PICCIRC's principal place of business was Greenwich, Connecticut. PICCIRC's tax matters partner is Tall Ships Capital Management, LLC (Tall Ships). Petitioner's principal place of business was in New York when the Petition was timely filed. PIMLICO's tax matters partner is John D. Howard.

*Overview*

This case concerns the tax treatment of a structured distressed debt investment transaction (transaction) involving transfers of distressed foreign trade receivables through several purported domestic partnerships. Three parties were centrally involved in the transaction: (1) BDO Seidman, LLP (BDO), a professional services firm providing accounting, tax, financial, and consulting services, that marketed the transaction; (2) Mr. Howard, who invested in the transaction; and (3) Gramercy Advisors, LLC (Gramercy Advisors), an investment advisory firm, that implemented the transaction on Mr. Howard's behalf.

The receivables involved in the transaction originated with Santa Bárbara Indústria e Comércio de Ferro Ltda. (Santa Barbara), a metal products supplier organized under the laws of Brazil. The receivables consisted of *duplicatas*,[2] i.e., orders for payments, issued by Santa Barbara in 1996 to Encol S/A Engenharia Comércio e Indústria (Encol), a real estate development and construction company organized under the laws of Brazil. Encol purchased products from Santa Barbara on

---

[2] Under Brazilian law, *duplicatas* are orders for payments issued by the creditor against the debtor related to the sales of goods or services that are evidenced by an invoice.

[*3] credit. Santa Barbara billed the trade receivables to Encol when it purportedly delivered goods to Encol in the ordinary course of business.

In 1997 Encol filed for bankruptcy protection. A Brazilian bankruptcy court granted Encol's petition, preventing adjudication of bankruptcy so long as Encol satisfied certain conditions concerning repayment of its creditors, and appointed a trustee to oversee the process. After Encol failed to meet the court's stated conditions by the end of 1998, the trustee recommended that the court declare Encol bankrupt. The court did so in 1999 and directed the liquidation of its assets.

On August 1, 2002, Santa Barbara contributed the Encol receivables using a tiered partnership structure. First, Gramercy Advisors and Santa Barbara formed XBOXT, LLC (XBOXT).[3] Santa Barbara contributed the Encol receivables in exchange for a 99% interest in XBOXT. Gramercy Advisors owned the remaining 1% membership interest. Second, XBOXT and Tall Ships, a limited liability company affiliated with Gramercy Advisors, formed PIMLICO. XBOXT contributed the majority of its Encol receivables to PIMLICO in exchange for a 99% membership interest, and Tall Ships acquired the remaining 1% interest.

Next, Mr. Howard became involved. He had significant investment experience including investments in distressed assets. In 2002 BDO approached Mr. Howard to pitch the distressed debt structure. BDO discussed with him tax benefits—including specific tax losses—that could be obtained through the transaction.

On December 10, 2002, Mr. Howard entered into a consulting agreement with BDO with respect to the transaction. Mr. Howard agreed to pay BDO a consulting fee of $865,000, while BDO agreed to provide Mr. Howard with an opinion letter concerning the federal income tax consequences of the transaction. BDO issued the opinion letter, dated October 15, 2003, to Mr. Howard.

Through BDO, Mr. Howard was introduced to Gramercy Advisors. On December 3, 2002, Mr. Howard entered into an investment management agreement with Gramercy Investment Management, LLC, an affiliate of Gramercy Advisors, with respect to an investment of $360,000.

---

[3] XBOXT was a limited liability company (LLC) formed under Delaware law.

[*4]   On December 11, 2002, Mr. Howard transferred $360,000 to an account at Boston Safe Deposit & Trust Co. (Boston Trust) managed by Gramercy Advisors for the benefit of Mr. Howard.  On that same day, Mr. Howard acquired an 89.10% membership interest in PIMLICO from XBOXT in exchange for $300,164.  An interest-bearing account for XBOXT at Boston Trust was opened on December 20, 2002.  On December 23, 2002, an internal transfer (i.e., from another Boston Trust account) of $300,164 was made into the XBOXT account.  After Mr. Howard's acquisition of his interest, PIMLICO's three members were Mr. Howard with an 89.10% interest, XBOXT with a 9.9% membership interest, and Tall Ships with a 1% interest.

PIMLICO and Tall Ships formed PICCIRC, a limited liability company under Delaware law.  On December 11, 2002, PIMLICO contributed 104 of the Encol receivables valued at Brazilian real 23,585,000 to PICCIRC for a 99% ownership interest.  Tall Ships contributed 0.1871% participation interests in two promissory notes for $900 each in exchange for 1% interest in PICCIRC.  RSK Investments, LLC, and Wester Gailes Capital Management, LLC, issued the notes.  The PICCIRC operating agreement valued the PIMLICO capital contribution at $333,335 and Tall Ships' contribution at $3,376.

On December 13, 2002, Mr. Howard entered into an Investment Advisory Services Fee Agreement with Mead Point Capital Management LLC (Mead Point), an affiliate of Gramercy Advisors that collects fees with respect to its separately managed accounts.  Under the terms of the agreement, Mr. Howard agreed to pay Mead Point a one-time fee of $59,836 with respect to the transaction.  (This figure represented the balance of the $360,000 Mr. Howard initially transferred to his account at Boston Trust after his payment to XBOXT of $300,164 for his PIMLICO interest.)

On December 26, 2002, PICCIRC sold all its Encol receivables to an affiliate of Gramercy Advisors, Gramercy Financial Services, LLC, for $357,144.  Mr. Howard was not aware of the sale by PICCIRC of its Encol receivables to Gramercy Financial Services, LLC.

On January 16, 2003, Gramercy Advisors received a facsimile copy of a letter, dated December 16, 2002, from Santa Barbara requesting a withdrawal of $300,164 of its membership interest in XBOXT and its payment to an account at Hudson United Bank for

**[\*5]** Kiesser Investments, SA.[4] XBOXT's account at Boston Trust, which had received a transfer of $300,164 on December 23, 2002, had a closing balance of $79 on January 30, 2003.

On January 21, 2003, Tojal Renault Advogados Associados issued a legal opinion related to the validity and enforceability of the assignment of the Encol receivables by Santa Barbara to XBOXT. This document represented that Santa Barbara had the necessary authority to perform its obligations.

On February 27, 2003, Proskauer Rose, LLP, sent a representation letter to Mr. Howard confirming that the firm would represent him in reviewing the tax consequences of the transaction. Pursuant to the representation agreement, Mr. Howard agreed to pay a fixed fee of $100,000.[5] On June 13, 2003, Mr. Howard executed a copy of the representation letter, agreeing to and accepting the terms set forth therein. Proskauer Rose issued a tax opinion letter, dated October 13, 2003, to Mr. Howard with respect to the transaction. The opinion letter represented that the transaction had the requisite economic substance and business purposes to be respected under the authorities discussed in the opinion letter.

On October 15, 2003, BDO issued a tax opinion letter to Mr. Howard. The opinion letter represented that no penalty should apply to the transaction pursuant to section 6662(b)(2) or (3).

On its Form 1065 for taxable year 2002, PICCIRC reported an ordinary loss of $22,718,351 from the transaction. This purported ordinary loss from the transaction was allocated to PIMLICO. Mr. Howard's share of the purported loss from the transaction was $20,446,516. He claimed flow-through ordinary loss deductions of $14,506,070 and $6,118,531 from PIMLICO for the taxable years 2002 and 2004, respectively.

---

[4] This letter was identical to a sample draft letter that Gramercy Advisors had sent to Santa Barbara, except with respect to the designation of the account to which the withdrawn funds were to be sent.

[5] On June 20, 2003, Mr. Howard paid $75,000 of this fee. On October 13, 2003, Proskauer Rose invoiced Mr. Howard for the remaining $25,000, which he paid on October 15, 2003.

**[\*6]**                                OPINION

I.      *Burden of Proof*

Generally, the Commissioner's determinations set forth in an FPAA are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Petitioner did not contend that the burden of proof should shift to respondent under section 7491(a).

II.     *Disguised Sale*

In general, partners may contribute capital to a partnership tax free and may receive a tax-free return of previously taxed profits through distributions to the extent that a distribution does not exceed adjusted basis. *See* §§ 721, 731. These nonrecognition rules do not apply, however, where the transaction is found in substance to be a disguised sale of property. *See Jacobson v. Commissioner*, 96 T.C. 577 (1991), *aff'd per curiam*, 963 F.2d 218 (8th Cir. 1992).

A disguised sale occurs where a partner contributes property to a partnership and receives a related distribution that is, in effect, consideration for the contributed property. *See* § 707(a)(2)(B); *Canal Corp. & Subs. v. Commissioner*, 135 T.C. 199, 210–11 (2010); Treas. Reg. § 1.707-3. A transaction may be deemed a disguised sale if, on the basis of all the facts and circumstances, (1) the partnership's transfer of money or other consideration to the partner would not have been made but for the partner's transfer of property and (2) if the transfers were not made simultaneously, the subsequent transfer was not dependent on the entrepreneurial risks of partnership operations. Treas. Reg. § 1.707-3(b)(1); *see also Route 231, LLC v. Commissioner*, 810 F.3d 247, 253 (4th Cir. 2016), *aff'g* T.C. Memo. 2014-30. The regulations provide that transfers between a partnership and a partner within a two-year period are presumed to be a sale of property to the partnership unless the facts and circumstances "clearly establish" otherwise. Treas. Reg. § 1.707-3(c)(1); *see Superior Trading, LLC v. Commissioner*, 728 F.3d 676, 681 (7th Cir. 2013) (finding the presumption triggered where the partner received a substantial distribution 10 months after contributing distressed receivables), *aff'g* 137 T.C. 70 (2011), *supplemented by* T.C. Memo. 2012-110. "This presumption places a high burden on the partnership to establish the validity of any suspect partnership

[*7] transfers." *Va. Historic Tax Credit Fund 2001 LP v. Commissioner*, 639 F.3d 129, 139 (4th Cir. 2011), *rev'g* T.C. Memo. 2009-295.

Petitioner contends that the transaction is not a disguised sale. In particular, petitioner argues that the record contains no evidence of a distribution to Santa Barbara within two years of its contribution of the Encol receivables. We disagree.

The timeline for the transaction is far less than two years. On August 1, 2002, Santa Barbara contributed the receivables to XBOXT. On December 16, 2002, Santa Barbara requested a withdrawal from XBOXT of $300,164. The withdrawal Santa Barbara requested is the same amount Mr. Howard paid to acquire an 89.10% interest in PIMLICO from XBOXT on December 11, 2002. Given that XBOXT had received a transfer of $300,164 into an interest-bearing account on December 23, 2002, but had a balance in that account of only $79 on January 30, 2003, we are satisfied that the $300,164 requested by Santa Barbara on December 16, 2002, was in fact paid from the XBOXT account sometime between December 23, 2002, and January 30, 2003.

The above facts do not appear to be coincidental. The facts and circumstances existing on the date of the earliest transfer are generally the relevant ones to be considered. Treas. Reg. § 1.707-3(b)(2). Petitioner has the burden of proving that there was no premeditated agreement that Santa Barbara would receive any distributions. The circumstances surrounding Santa Barbara's partial redemption of its XBOXT interest suggest that it was a preconceived step to shift basis to Mr. Howard.

The payment to Santa Barbara was not paid out of operational profits but rather from the proceeds of Mr. Howard's subsequent acquisition of an interest in PIMLICO from XBOXT. The redemption and acquisition are for the same amount. Mr. Howard's acquisition was made five days before the date on the Santa Barbara redemption letter. The purpose of the redemption was to trigger the section 704(c) loss allocation rule for the benefit of Mr. Howard. The dates and account activity of the partnerships match to such an extent that it becomes clear that XBOXT was formed solely as a conduit to execute a disguised sale of the Encol receivables.

Petitioner has offered no alternate explanation for this account activity or posited where more than $300,000 in funds went between December 23, 2002, and January 30, 2003. Petitioner has failed to

[*8] counter these facts and has failed to meet its burden of proof. Therefore, the transaction is a disguised sale. Accordingly, we sustain respondent's disallowance of PICCIRC's claimed loss deduction to the extent that the claimed loss exceeds the transferred basis from XBOXT (via PIMLICO) in the Encol receivables.

III.    *Basis in Encol Receivables*

Pursuant to section 723, the basis of property contributed to a partnership by a partner shall be the partner's adjusted basis at the time of the contribution. In other words, the basis equals the basis the asset had in the hands of the contributing partner. Santa Barbara purportedly transferred the Encol receivables to XBOXT as the first step in the transaction.

The only evidence related to basis are the 125 *duplicatas* and a spreadsheet prepared by Gramercy Advisors listing the *duplicatas*. These documents do not provide enough information to determine the value of the *duplicatas* immediately before Santa Barbara's contribution of them to XBOXT. Therefore, we cannot determine the basis in the Encol receivables.

IV.    *Validity of Partnerships*

A partnership exists for federal income tax purposes when parties intend to join together in the conduct of a trade or business and to share in the profits or losses of that trade or business. *Commissioner v. Tower*, 327 U.S. 280, 286 (1946). Whether a partnership is respected for federal tax purposes depends upon whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949). To form a bona fide partnership, the parties "must have two intents: (1) the intent to act in good faith for some genuine business purpose and (2) the intent to be partners, demonstrated by an intent to share 'the profits and losses.'" *Chemtech Royalty Assocs., LP v. United States*, 766 F.3d 453, 461 (5th Cir. 2014); *see also Commissioner v. Culbertson*, 337 U.S. at 741–43; *Commissioner v. Tower*, 327 U.S. at 286–87; *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 483–84 (5th Cir. 2011). In determining whether a bona fide partnership has been formed, we must consider all relevant facts and circumstances, including "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties,

**[\*9]** their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent." *Commissioner v. Culbertson*, 337 U.S. at 742.

All the partnerships involved in this transaction were LLCs created under Delaware law. Pursuant to the check-the-box regulations under Treasury Regulation § 301.7701-3(b)(1), an LLC is classified as a partnership by default unless it elects to be classified as a corporation. This regulation does not entitle a partnership to the benefits provided by the Code to partnerships. *Superior Trading, LLC v. Commissioner*, 728 F.3d at 681.

There is no evidence that Santa Barbara and Gramercy Advisors, partners of XBOXT, endeavored to join in a common enterprise with a community of interest in profits and losses. The purported partners were accomplices to the transaction. The same is also true for PICCIRC. There is no evidence that PICCIRC, PIMLICO, and Tall Ships were engaged in business together.

The abundance of "abusive tax-avoidance schemes . . . designed to exploit the Code's partnership provisions" requires that "our scrutiny of the taxpayer's choice to use the partnership form [be] especially stringent." *Southgate Master Fund*, 659 F.3d at 483–84. A partnership need not be respected "merely because the taxpayer can point to the existence of some business purpose or objective reality in addition to its tax-avoidance objective." *TIFD III-E, Inc. v. United States* (*Castle Harbour*), 459 F.3d 220, 232 (2d Cir. 2006). Rather, the parties' reasons for choosing the partnership form "must, on balance, display good 'common sense from an economic standpoint.'" *Southgate Master Fund*, 659 F.3d at 484 (quoting *Boca Investerings P'ship v. United States*, 314 F.3d 625, 631 (D.C. Cir. 2003)). Even where a partnership engages in transactions having economic substance, the parties' choice to operate as a partnership must be for "a legitimate, profit-motivated reason," *id.*, and "the absence of a nontax business purpose is fatal," *ASA Investerings P'ship v. Commissioner*, 201 F.3d 505, 512 (D.C. Cir. 2000), *aff'g* T.C. Memo. 1998-305; *see also Castle Harbour*, 459 F.3d at 231–32; *Andantech L.L.C. v. Commissioner*, 331 F.3d 972, 980 (D.C. Cir. 2003), *aff'g in part and remanding* T.C. Memo. 2002-97; *Merryman v. Commissioner*, 873 F.2d 879, 881 (5th Cir. 1989), *aff'g* T.C. Memo. 1988-72.

**[\*10]** The partnership antiabuse rules provide that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K. Treas. Reg. § 1.701-2. Pursuant to these rules, a partnership satisfies the general antiabuse rule if it meets three conditions: (1) the partnership is bona fide and each partnership transaction or series of transactions is entered into for a substantial business purpose; (2) each partnership transaction is respected under substance over form principles; and (3) the tax consequences to each partner must accurately reflect the partners' economic agreement unless deviation therefrom is clearly contemplated by subchapter K. *Id.* para. (a). Where a partnership is formed to facilitate a transaction a principal purpose of which is to produce tax consequences inconsistent with the intent of subchapter K, the Commissioner may recast partnership transactions to achieve tax results intended by subchapter K. *Id.* para. (b). The Commissioner has broad authority to disregard the partnership to justify or modify the claimed tax treatment.

Whether a partnership satisfies the antiabuse regulation is determined on the basis of all of the facts and circumstances. *Id.* para. (c). The regulation provides a list of illustrative factors that may indicate a disregard for the intent of subchapter K. *Id.* para. (c). The factors relevant to this case include the following: (1) the present value of the aggregate federal tax liability of the partners is substantially less than if the partners had owned the partnership's assets and conducted the partnership's activities directly; (2) the present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions designed to achieve a particular end result were integrated and treated as steps in a single transaction; and (3) one or more partners who are necessary to achieve the claimed tax results have a nominal interest in the partnership and are substantially protected from any risk of loss from the partnership's activities. *Id.*

Relevant to the first two factors listed above is that if Mr. Howard had purchased the assets directly from Santa Barbara, PICCIRC's basis in the receivables at the time of the sale that produced the losses would have been significantly lower than what was claimed. If, as our disguised sale analysis concludes, (1) Santa Barbara's contribution of the Encol receivables to XBOXT, (2) XBOXT's contribution of the receivables to PIMLICO, and (3) XBOXT's sale of its 89.1% interest in PIMLICO to Mr. Howard were integrated into a single transaction, the result would effectively be a direct sale of the receivables from Santa

[*11] Barbara to Mr. Howard. The tax consequence of such a sale would be that Mr. Howard would have received a cost basis in the receivables under section 1012, as opposed to the significantly larger basis claimed to be transferred from Santa Barbara through XBOXT and then to PIMLICO under section 721. The subsequent contribution of the receivables to PICCIRC would be deemed made by Mr. Howard himself, and PICCIRC's basis would be equal to Mr. Howard's cost basis. *See* § 721. The subsequent sale of the receivables by PICCIRC would, in turn, produce significantly lesser losses. The parties' aggregate federal tax liability would, consequently, be substantially higher.

Further, Santa Barbara had no risk of loss because XBOXT and PICCIRC had no activities besides the sale of tax shelters. Santa Barbara had a nominal interest in XBOXT and no real participation. Upon our consideration of the facts and circumstances, we conclude that the partnerships should be disregarded for violation of the partnership antiabuse rules.

V.     *Other Issues Petitioner Raises*

Petitioner contends that it was in compliance with the Code and that the Court should not address judicial antiabuse doctrines such as economic substance, sham transaction, business purpose, and step transaction. Respondent disagrees with this argument. We do not need to address the arguments associated with these doctrines because we have concluded that the transaction was a disguised sale and the partnerships were shams. An analysis similar to that discussed above would be used for an analysis under these doctrines. A discussion of these doctrines would not change our conclusion that respondent's determination is correct.

VI.     *Accuracy-Related Penalties*

Section 6662 provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Section 6662(h)(1) increases the penalty rate from 20% to 40% to the extent that the underpayment is attributable to a gross valuation misstatement. A gross valuation misstatement exists where the value or adjusted basis of the property claimed on a return is 400% or more of the amount determined to be

**[\*12]** correct.[6]   If the value or adjusted basis of the property is determined to be zero, the gross valuation misstatement penalty is applicable.  Treas. Reg. § 1.6662-5(g).

Section 7491(c) generally places the burden of production of evidence on the Commissioner with respect to a taxpayer's liability for any penalty imposed by the Code.  § 7491(c).  In cases involving partnerships to which the TEFRA provisions apply, as is the case here, section 7491(c) does not apply.  *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 235–36 (2018).  Petitioner therefore carries the burden of showing that respondent's determination to impose the penalty is erroneous.  *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115.

Under our disguised sale analysis, PICCIRC's basis is, at the most, $300,164.  PICCIRC's reported basis of $23,075,495 on the 2002 partnership return is well in excess of 400% of the correct basis.  Petitioner produced no evidence to refute respondent's determination concerning the penalty.  Further, petitioner's posttrial briefs fail to address the accuracy-related penalty.  We deem petitioner to have conceded the issue, and we sustain respondent's penalty determination at the heightened rate.  *See* Rule 151(e)(4) and (5); *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (first citing *Clajon Gas Co. v. Commissioner*, 119 T.C. 197, 213 n.17 (2002), *rev'd*, 354 F.3d 786 (8th Cir. 2004); then citing *Davis v. Commissioner*, 119 T.C. 1, 1 n.1 (2002); then citing *Nicklaus v. Commissioner*, 117 T.C. 117, 120 n.4 (2001); and then citing *Rybak v. Commissioner*, 91 T.C. 524, 566 n.19 (1988)).

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[6] The Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, 120 Stat. 780, effected certain amendments to the gross valuation misstatement penalty regime. Before the enactment of the PPA, the penalty applied when taxpayers misstated the value of property by 400% or more; PPA § 1219(a)(2), 120 Stat. at 1083, lowered the threshold to 200%.  *See* § 6662(h).  This case involves a return filed before the effective date of the PPA (August 17, 2006), and therefore we apply the higher threshold.