# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 27, 2021

Lyle W. Cayce
Clerk

No. 20-20213

Jerod Hobbs; Ronald Lee; Jordon Arroyo; Arlen Jones,

*Plaintiffs—Appellants/Cross-Appellees*,

*versus*

EVO Incorporated; Francis Neill; Sam Copeman,

*Defendants—Appellees/Cross-Appellants*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:16-CV-770

Before Higginbotham, Stewart, and Wilson, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:

The parties in this overtime-wage dispute provided video services to well owners, allowing them to view and diagnose what has gone awry down the borehole. In these cross-appeals, the plaintiff field engineers and their former employers offer differing views of what went awry when the district court assessed the parties' arguments and evidence after a three-day bench trial. According to the employers, EVO and its two officers, the errors lie in the district court's determinations that field engineers were non-exempt employees, that the failure to pay field engineers overtime violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., and that Plaintiffs

No. 20-20213

offered adequate evidence of the wages owed. According to Plaintiffs, the errors lie in the district court's rulings on damages and attorney's fees, namely that plaintiffs had a fluctuating workweek, limiting them to half-time—not time-and-a-half—overtime wages, and that counsel's fees should be reduced for pursuing meritless arguments. We AFFIRM.

## I.

EVO Incorporated offers downhole video camera services to clients in the oil and gas industry. The company employs proprietary camera technology to enable well owners to identify and diagnose issues that interrupt a well's productivity.[1]

Plaintiffs Jerrod Hobbs, Ronald Lee, Arlen Jones, and Jordan Arroyo worked for EVO as field engineers for varying periods between 2011 and 2018.[2] As field engineers, Plaintiffs drove long distances, often on short notice, to provide EVO's camera services at clients' well sites. At the well site, field engineers were often EVO's only representative to the client. While onsite, they interacted with and took direction from the client's representative, the "company man." Field engineers also interacted with wireline operators, who helped to lower the camera into the well. Before filming, field engineers would sample well water from a holding tank and assess its clarity by dropping a coin into a bottle of the fluid to see whether the coin's features remained visible. They would then advise the company man on the quality of the images that could be obtained.

---

[1] *Hobbs v. EVO Inc.*, 394 F. Supp. 3d 717, 720 (S.D. Tex. 2019).

[2] Hobbs from September 1, 2011 until August 6, 2018; Lee from September 2, 2014 until May 4, 2018; Arroyo from January 1, 2013 until January 26, 2016; Jones from April 2011 until October 5, 2014.

No. 20-20213

When the company man was ready to begin, field engineers would assemble and "rig up" EVO's camera, attaching it to the wireline and then, with the assistance of the wireline crew, "stab" the camera into the well. Once the camera was lowered into the well, field engineers would go into the wireline truck along with the company man and wireline operator to observe the video images. Field engineers would operate the camera from inside the truck and direct the wireline operator on the speed of the camera's descent. When the camera reached a point of interest, field engineers would communicate what they saw on screen to the company man. Field engineers also made annotations in the video log during filming, which described well conditions and allowed the client to locate specific points in the footage. When the company man was satisfied with the images, the wireline operator removed the camera from the well, and field engineers would begin rigging-down and cleaning the camera. "After a job was complete, the field engineers would give EVO's customers a thumb drive that contained downhole video, the job log and individual pictures requested by the customer [.]" One field engineer, Lee, sometimes followed up with clients after leaving the well site to provide further observations on the recorded well footage.[3]

Although Plaintiffs often worked alone in the field, within the company, they were supervised by EVO's operations manager, a role occupied originally by Troy Sutherlin and later by Arthur White. The operations manager typically received clients' work requests, spoke with a field engineer to apprise him of the clients' issue, and then sent the field engineer to the well site. Field engineers were not licensed engineers or petroleum engineers, and none of the Plaintiffs had engineering degrees. Instead, Sutherlin or White provided field engineers with some on-the-job

---

[3] *Hobbs*, 394 F. Supp. 3d at 730.

No. 20-20213

training in "understanding the technology, obtaining downhole knowledge, and learning how to interpret what the field engineers saw on the screen."[4]

Throughout Plaintiffs' employment, EVO treated field engineers as exempt from the FLSA's overtime requirements. Plaintiffs' employment contracts indicated that their compensation consisted of an annual salary and eligibility for certain bonuses. Perhaps because field engineers were treated as exempt, they did not closely track their work hours. Instead, for most of their tenures, field engineers were directed by EVO's operations managers to record twelve-hour days when they worked at a client's well site and eight-hour days when they stayed in the shop, repairing or cleaning tools and completing job paper work.

Plaintiffs filed this case as a putative collective action in March 2016, seeking unpaid overtime wages and liquidated damages for willful violation of the FLSA. Plaintiffs named EVO and several company officers as defendants.[5] Although Plaintiffs sent notices, no other field engineers joined the collective action. The district court granted summary judgment to one EVO officer and concluded that EVO committed no willful FLSA violation. But the district court found that genuine disputes remained concerning Plaintiffs' exempt status. The district court determined that the scope of the dispute was limited by the two-year statute of limitations but otherwise allowed Plaintiffs' overtime claims to proceed to trial.

Plaintiffs tried their overtime claims in a bench trial before Judge Andrew Hanen. After three days of testimony and evidence, the district court

---

[4] *Id.* at 735.

[5] Two individual defendants were dismissed from the case, one before trial, and another during trial. *Id.* at 720 nn. 2-3. Only EVO's former CEO, Francis Neill, and its CFO, Sam Copeman, remain. Because they rely on the same claims of error as EVO itself, for simplicity's sake, we refer to the defendants collectively as EVO.

No. 20-20213

solicited further briefing and proposed fact findings from the parties. Ultimately, the district court rejected EVO's contentions that field engineers were exempt highly-compensated, administrative, or sales employees.[6] So, it concluded that EVO had violated the FLSA by failing to pay Plaintiffs overtime for their work hours in excess of forty per week. The district court declined to award liquidated damages because the violations were not willful, but its order left the remaining damages issues unresolved.[7]

After trial, the district court ordered the parties to mediate the "outstanding non-liability issues." The court advised the parties to reach a settlement because "the time records are not reliable" and the "damage evidence produced at trial is neither precise nor compelling for either side." When mediation failed to produce a settlement, the district court ordered supplemental briefing on damages. After criticizing the parties for failing to assist with specific fact findings, the district court found that the combination of Plaintiffs' time sheets and trial testimony "provide[d] an adequate baseline for the Court to make a just and reasonable inference as to the amount of hours Plaintiffs worked in excess of the standard forty-hour workweek." The district court, after adjusting the hours downward based on errors EVO identified, calculated each Plaintiff's overtime wages using the .5 multiplier, which the court deemed applicable because Plaintiffs' hours fluctuated from week to week. The district court awarded Jones $11,166.91; Arroyo $7,618.59; Lee $41,451.48; and Hobbs $119,139.60 in unpaid overtime wages.

---

[6] *Id.* at 748.

[7] *Id.* ("The Court notes that this order only resolves the issue of liability. It will issue a separate order regarding how it wants to proceed with regard to the determination of damages, attorney's fees, and costs.").

No. 20-20213

The last issue resolved by the district court in a separate order was Plaintiffs' claim for attorney's fees. In calculating the lodestar amount, the district court determined that $450 was a reasonable hourly rate, and then reduced the rate to $400 based on counsel's pursuit of certain arguments, which the district court deemed meritless; namely pursuit of class certification and of the 1.5 multiplier for overtime damages. The district court also reduced the total hours counsel submitted to exclude administrative tasks, time spent "pursuing claims that clearly had no real hope of success," and time which the court deemed "excessive." Ultimately, the district court awarded $240,588.00 in fees and $24,768.80 in costs. The parties cross appealed.

## II.

On appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo.[8] "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole . . . or so long as this court has not been left with the definite and firm conviction that a mistake has been made."[9] "Thus, when the district court's account of the evidence is plausible, reversal is improper, even if the reviewing court would have weighed the evidence differently."[10]

"Under the FLSA, an employer must pay overtime compensation to its non-exempt employees who work more than forty hours a week."[11] The FLSA provides exemptions from the general rule of overtime for "those

---

[8] *Chemtech Royalty Assocs., L.P. v. United States*, 766 F.3d 453, 460 (5th Cir. 2014).

[9] *Id.* (internal quotations and citations omitted).

[10] *Fraser v. Patrick O'Connor & Assocs., L.P.*, 954 F.3d 742, 745 (5th Cir. 2020), *as revised* (Apr. 7, 2020) (internal quotations omitted).

[11] *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 272 (5th Cir. 2020).

employees working in a bona fide executive, administrative or professional capacity."[12] We give FLSA exemptions a "fair reading," not a narrow one.[13] But the burden of establishing an exemption remains with the employer, who must do so by a preponderance of the evidence.[14] "Whether an employee is within an exemption is a question of law, but how an employee spends his working time" and "[i]nferences about the nature of an employee's work" are all treated as questions of fact.[15]

### A. Exemption for Highly Compensated Employees

On appeal, as below, EVO contends that three Plaintiffs—Hobbs, Lee, and Jones—are highly compensated employees exempt from the FLSA's overtime requirements per 29 C.F.R. § 541.601. To qualify for the Highly Compensated Employee (HCE) exemption, EVO must show that a field engineer "(1) is annually compensated at least $100,000; (2) 'customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee,' § 541.601(a); and (3) has within his or her primary duties the performing of office or non-manual work, § 541.601(d)."[16] Because a "high level of compensation is a strong indicator of an employee's exempt status," an employee meeting the compensation threshold will qualify for an exemption so long as "the employee customarily and regularly performs any one of the exempt duties or responsibilities of an executive, administrative or

---

[12] *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000) (citing 29 U.S.C. § 213(a)(1)).

[13] *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

[14] *Adams v. All Coast, L.L.C.*, 988 F.3d 203, 206 (5th Cir. 2021).

[15] *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020).

[16] *Id.* at 685.

professional employee"[17] "even if 'the employee does not meet all of the other requirements' for the underlying administrative, executive, or professional exemption."[18]

Although HCE is a standalone exemption, its applicability must be determined by reference to other exemptions, which define the duties that qualify as exempt under the FLSA. Here, EVO contends three Plaintiffs were highly compensated and regularly performed at least one exempt administrative duty as defined by 29 C.F.R. § 541.200. Because EVO's argument for the HCE exemption is based on administrative duties, we consider our precedents applying the standalone administrative exemption where the two exemptions overlap.[19]

An employee's duties are considered administrative—and thus, exempt—if they entail (1) "non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (2) "the exercise of discretion and independent judgment with respect to matters of significance."[20] Although the administrative exemption phrases these elements conjunctively, for purposes of the HCE exemption, it would suffice for EVO to show that field engineers satisfy *either* element.[21] Moreover, we look to those duties a field engineer customarily and regularly performs, instead of looking only to their primary duty.[22]

---

[17] 29 C.F.R. § 541.601(a)(1), (c).

[18] *Smith*, 956 F.3d at 685 (quoting § 541.601(c)).

[19] *Smith*, 956 F.3d at 686.

[20] 29 C.F.R. § 541.200(a)(2)-(3).

[21] *See Smith*, 956 F.3d at 685.

[22] *Id.*

No. 20-20213

EVO contends that field engineers satisfied both the directly-related-to-management and the discretion-independent-judgment elements because they "spent their most important time inside a wireline truck interpreting and analyzing footage (using a computer) to identify the wellbore problem." EVO elaborates that "field engineers (1) planned how best to obtain wellbore footage; [and] (2) analyzed (and annotated) the footage to help explain what it showed."[23] The district court rejected this argument, finding that field engineers "did not as their primary job or regularly perform any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee."[24] The district court reasoned that "Plaintiffs' work was more analogous to the examples contemplated in 29 C.F.R. § 541.601(d), which are not exempt regardless of how high their pay grade."[25]

EVO argues that the district court applied too high a standard because the court determined that the "overarching question" for the HCE exemption was "whether Plaintiffs' *primary* duties included office or non-manual work that would fall under a different exemption." EVO's criticism may be fair because the district court's framing indicates that it was focused narrowly on Plaintiffs' primary duty rather than looking at Plaintiffs' regular and customary duties, but reversal is warranted only if EVO satisfies the less

---

[23] EVO faults the district court for not "mention[ing] the field engineers' sales duties in connection with the highly compensated exemption," suggesting that EVO thinks it's an exempt duty. But EVO then drops the subject and omits any discussion of sales duties from its analysis of the exemptions. EVO neither cites the standalone outside-sales exemption, *see* 29 C.F.R. § 541.500, nor points the Court to cases analyzing what sales duties are exempt. For this reason, EVO has waived any argument that field engineers are exempt based on their outside sales. *See Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 414 (5th Cir. 2021) ("When a party pursues an argument on appeal but does not analyze relevant legal authority, the party abandons that argument.").

[24] *Hobbs*, 394 F. Supp. 3d at 746.

[25] *Id.*

No. 20-20213

stringent standard.[26] EVO also contends that the district court erred in its factual findings by ignoring the field engineers' responsibilities for interpreting and analyzing video footage for EVO's clients.

*Compensation*. An employee must receive a "high" level of compensation to qualify for this exemption. For most of the period relevant to Plaintiffs' claims, the threshold was $100,000 in total annual income, though from December 1, 2016 to December 31, 2019, the threshold was raised to $134,004.[27] The parties do not contest the compensation element here, and the district court found that three Plaintiffs had annual earnings satisfying the threshold amount for at least one of the years in question.[28] So, field engineers meet this element of the exemption.

*Duties involving the exercise of independent discretion or judgment*. EVO argues that field engineers regularly exercised discretion and independent judgment. A duty may be administrative in nature if it requires the employee to use his independent discretion or judgment concerning "matters of significance."[29] Typically, this "involves the comparison and the

---

[26] *See Smith*, 956 F.3d at 684 ("In contrast to the HCE exemption, the standalone administrative exemption depends only on the employee's primary duty rather than the employee's customary duties.").

[27] 29 C.F.R. § 541.601 (effective: December 1, 2016 to December 31, 2019).

[28] *Hobbs*, 394 F. Supp. 3d at 746. EVO concedes that Arroyo never made enough annually to qualify for the HCE exemption; EVO also concedes that Lee made enough during only one of the four years for which he seeks unpaid overtime. Further, though unacknowledged by the parties and the district court, the compensation threshold was raised to $134,004 annually between December 2016 and December 31, 2019. The consequence is that at least one of the four years for which Hobbs seeks overtime pay (2017) would not qualify for the exemption because he earned only $125,140.33.

[29] 29 C.F.R. § 541.202(a).

evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[30]

EVO contends that field engineers' film preparations, such as decisions regarding the camera's setup and configuration of well equipment based on well conditions, meet this standard. EVO is incorrect. Section 541.202 clarifies that an employee does not exercise discretion or judgment in the relevant sense if his decisions are essentially "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."[31] The district court found that when filming or preparing to film a well, "the field engineers follow guidelines provided by EVO for operating those tools and were also provided with a maintenance schedule and operations manual."[32] The trial record supports this fact finding. Arthur White, Plaintiffs' former supervisor, explained that a field engineer's planning prior to leaving for a job amounted to "mak[ing] sure that they are going out there with the right equipment primarily." White acknowledged that the "techniques used by the EVO [] field engineers in recording downhole video" are "well-established within the company." He also acknowledged that a field engineer's water assessment was based on a "well-established technique and procedure that is used in the downhole video recording industry."

When it came to how much video a field engineer captured or the portions of the well to be filmed, the record indicates that field engineers took direction from the company man. Trial testimony also indicated that field engineers needed approval from their managers, Troy Sutherlin or Arthur

---

[30] *Id.*

[31] *See* 29 C.F.R. § 541.202(e).

[32] *Hobbs*, 394 F. Supp. 3d at 729.

White, to deviate from EVO's field work policies, a fact indicating that field engineers lacked *independent* discretion on matters of significance. In light of this evidence, the fact that "every well is different" to some degree does not establish that field engineers were regularly making discretionary decisions outside of EVO's established guidelines and procedures. To the extent there was some testimony to the contrary, the district court, as the designated factfinder, was within its discretion to resolve the dispute in Plaintiffs' favor.[33]

Closer to the mark is EVO's argument that field engineers exercised judgment when interpreting or analyzing video footage for clients. EVO portrays field engineers as roving consultants who reviewed video footage and diagnosed the issue in a client's well. EVO is quick to note that field engineers had no manuals or guidelines for this task and that interpretive judgments are based on field engineers' on-the-job experience. The district court formed a different view. It determined that while the camera was in the well, "the field engineers observed what was visible from the cameras on a screen from a different location at the wellsite, during which they would annotate the video."[34] The district court credited Plaintiffs' testimony that they were not consultants or well experts but "expert[s] at operating [EVO's] camera," who were onsite not to offer analysis but to obtain usable images for the clients.[35]

---

[33] *See Olibas v. Barclay*, 838 F.3d 442, 449 (5th Cir. 2016) ("It was a pure jury question whether to believe the employees or the employer."); *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 339 (5th Cir. 2017) ("A reasonable jury could credit this testimony and find that the plaintiffs exercised no discretion as mud engineers and merely appl[ied] well-established techniques, procedures or specific standards described in manuals or other sources." (internal quotations omitted)).

[34] *Hobbs*, 394 F. Supp. 3d at 729.

[35] *Id.*

The record is somewhat vague regarding what interpretation or analysis field engineers actually performed for clients. The district court found, and EVO does not contest, that field engineers were not licensed engineers or petroleum engineers.[36] Nor does EVO identify evidence of formal training field engineers underwent to properly interpret video footage from a well. While observing the video feed, field engineers would make annotations and provide their notes to clients along with the video footage. The district court found that the annotations were a field engineer's "best guess about what he saw" on screen.[37] The trial record supports the conclusion that field engineers' annotations were generally descriptive, a running account of the video that the client could later reference to locate particular points in the recording. Thus, the notes were a means of giving the client more data on well conditions and improving EVO's final product, the video footage.

EVO offers one specific example of a field engineer's analysis in its briefs, taken from a job summary by Hobbs in which he wrote:

> Spotted 2 obstructions. First was A [sic] piece of overshot that was left down hole roughly less than a foot above the sheered [sic] off tubing from last fishing attempt. The second was the tubing itself. Sheered [sic] off smooth leaning against the high side. Company men were satisfied with images and decided to come out of hole.

EVO's own example tends to support the view that what field engineers offered clients, either verbally or in their notes, was descriptive, not analytic. Other examples not quoted by EVO show that, in some instances, Lee would follow up with clients via email, offering additional explanations of the video

---

[36] *Id.* at 725.

[37] *Id.* at 729.

but without offering an opinion on possible solutions for whatever the video tended to show. The distinction matters because a duty is typically not administrative without an exercise of discretion "involv[ing] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."[38] It is true that an employee may still "exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level," but some sort of recommendation is a prerequisite for this caveat.[39] Thus, even analysis or interpretation, assuming field engineers regularly offered any, is insufficient in the absence of a recommendation.

EVO identifies no examples of field engineers translating their observations into advice or recommendations regarding what the client could or should do with its well.[40] This is likely because recommendations, even non-final ones, were beyond the field engineers' limited expertise. The district court found that even in their basic descriptions, field engineers often used vague language to avoid definitively identifying well features.[41]

---

[38] 29 C.F.R. § 541.202(a). The regulations clarify that the "exercise of discretion and independent judgment also does not include . . . recording or tabulating data . . . . An employee who simply tabulates data is not exempt, even if labeled as a 'statistician,'" indicating that data collecting responsibilities are not administrative if the employee simply conveys that data to an actual decision-maker. *Id.* § 541.202(e).

[39] *Id.* § 541.202(c).

[40] The few Lee emails to clients are the most analytical descriptions of well conditions given by a field engineer in the record. But the evidence does not establish that even this level of detail was customary or regular for field engineers.

[41] "For example, Jones testified that he never used definitive language to describe what he thought he saw on camera. Sutherlin testified that they used indefinite language, such as a "possible hole," because there was no way to write on a job ticket what the problem was with 100 percent certainty. Plaintiffs also testified that they could only explain what they currently saw, but did not know from the footage what had previously occurred in the well." *Hobbs*, 394 F. Supp. 3d at 729–30.

Moreover, witnesses from both sides confirmed that field engineers would not propose solutions to EVO's clients or advise them of possible options for remediation. An exchange between Plaintiffs' counsel and EVO's CEO, Fraser Louden, is illustrative:

> Q. . . . So very specifically, as the service provided by field engineers, do they tell the company man or the customer, If this is the problem, then you need to solve it by one of several alternatives once a problem has been identified downhole?
>
> A. No, they wouldn't put it like that. That's not the -- their responsibility.
>
> . . . .
>
> Q. So with that question, was that a service provided by field engineers?
>
> A. No. They wouldn't normally give a list of alternatives or options, no.
>
> Q. Was that a duty that they would provide?
>
> A. No.
>
> Q. That would be outside the scope of the responsibility and duties of a field engineer for EVO Incorporated, wouldn't it?
>
> A. Yes.

Troy Sutherlin, Plaintiffs' former supervisor, testified that field engineers never "tried to tell the customer what caused the problem" because they "did not have the expertise or the training to tell them what caused the problem." Similarly, Jones testified that field engineers were neither trained nor allowed by EVO to recommend solutions to the company

man. The district court credited comparable testimony from Lee.[42] And Francis Neill, EVO's former CEO, gave testimony to the same effect. Thus, the district court had ample basis for concluding that Plaintiffs' monitoring and annotating video footage did not require them to evaluate possible courses of conduct or make decisions after considering various possibilities.[43] In sum, Plaintiffs' purported interpretive or analytic responsibilities did not entail the customary or regular exercise of judgment or discretion.

***Duties directly related to management or general business operations.*** Next, EVO argues that field engineers' responsibilities related directly to the management or business operations of EVO and its customers. "To satisfy this requirement, an employee's work must directly relate to assisting with the running of the company, as opposed to simply doing work related to the production of the business's products or services."[44] A duty may be administrative under this prong for purposes of the HCE exemption even if it does not entail an exercise of judgment or discretion.[45] Section 541.201 gives examples of qualifying duties, including:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government

---

[42] *Id.* at 729 ("Lee explained that of the people watching the screen, he was probably the least qualified to make any recommendations as to what the company could do based on what showed up on the screen.").

[43] *Fraser*, 954 F.3d at 745 ("Giving greater weight to certain testimony can virtually never be clear error because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." (internal quotations and citation omitted)).

[44] *Id.* at 746.

[45] *Smith*, 956 F.3d at 685.

relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

Of these, EVO invokes the "quality control" category, arguing that field engineers' duties "require[] ensuring quality footage and analysis, the field engineers perform the main business function of EVO itself." EVO relies on the same basic responsibilities/duties cited for the judgment prong discussed above. But here, EVO adds that field engineers managed the onsite operations and served as the company's "face" by "interact[ing] directly with clients on EVO's behalf." EVO also explains that field engineers' work is critical to clients' businesses because the service they provide can "save EVO's customers millions of dollars." Without much explanation, the district court found that "[w]hile at EVO, at all times pertinent to this case Plaintiffs did not . . . . [w]ork on . . . quality control." [46]

EVO's evidence of quality-control-related duties is thin; the company cites a few lines of testimony from Arthur White and Francis Neill. White testified generally that "we have got to make sure we have got a quality product, a quality fluid so that we can deliver good video to the client." In an exchange with Plaintiffs' counsel, he identified only one way in which field engineers ensure video quality:

> Q. As far as quality control, what you are looking at is the cup test and looking in the -- looking to see if you can see? That's essentially what you are referring to, isn't it?
>
> A. Well, that's part. The cup test is a small part, but the end product being a good clear video that's the quality video that we're after, right.

---

[46] *Hobbs*, 394 F. Supp. 3d at 744-45.

Q. Sure. But the quality control aspect of it is primarily making sure that the fluids are not too opaque or they are clear enough to be able to see, right?

A. Correct.

To this, Neill added only that "[i]f we don't get pictures, which is usually due to fluid clarity and not necessarily solely due to that very simple test that is described. So if we don't get a picture, we are in the penalty box." Neill alluded to other quality control issues but identifies no quality-control responsibilities a field engineer might have beyond the fluid test that White mentions. For example, no trial testimony indicated that field engineers went back to assess, edit, or improve the visual quality of the videos or that they reviewed the video footage obtained by other field engineers for quality purposes. Thus, EVO's only specific evidence of quality-control duties is that field engineers would examine the clarity of the well fluid before filming to assess whether the camera could record usable images once inside the well.

Field engineers testified that their typical fluid-clarity test involved simply dropping a coin in a bottle of well fluid to see if the coin's features remained visible. It is a stretch to characterize this simple test as quality control in any meaningful sense. In essence, EVO conflates field engineers' efforts to produce usable images with a responsibility to oversee the general quality of EVO's business, which White conceded they were not entrusted with.

But EVO claims to find support for this view in our unpublished *Zannikos v. Oil Inspections* decision, arguing that, like the marine superintendents in that case, field engineers were charged with ensuring the quality of the company's product, not with its production.[47] The

---

[47] *See Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349, 355–56 (5th Cir. 2015).

responsibilities of marine superintendents in *Zannikos* are in many respects distinguishable from those of field engineers: superintendents performed no production-related work, they supervised the work of independent inspectors, they ensured compliance with regulatory standards, and they performed several tasks directly related to quality control, including ensuring that gas and oil "were blended according to the proper ratios," "monitor[ing] the loading and unloading of cargo and report[ing] any errors or losses," and "inspecting loading and discharge equipment."[48] We held that these facts made superintendents' duties a form of quality control sufficiently administrative for purposes of the HCE exemption.[49]

In a more recent published opinion, *Dewan v. M-I, L.L.C.*, we rejected the proposed equivalence between duties of marine superintendents and those of mud engineers by noting that the latter "neither assured compliance with health and safety standards nor engaged in tasks likely to qualify as the general administrative work applicable to the running of any business."[50] We determined that mud engineers were not involved in quality control by drawing the following distinction: "quality control, particularly considering the list of which it is a part, seems to mean the quality of the mud being provided to M-I's customers and not with monitoring and adding materials

---

[48] *Id.* at 351.

[49] *Id.* at 359. We also held that superintendents failed to meet the requirements of the standalone administrative exemption because they exercised neither discretion nor judgment in these duties. *Id.* at 356.

[50] 858 F.3d at 338. EVO spends several pages discussing why *Dewan* is inapplicable here. EVO is correct that *Dewan* was in a different procedural posture (reversing summary judgment), and it preceded the Supreme Court's recent admonition to construe FLSA exemptions "fairly," not narrowly. *Navarro*, 138 S. Ct. at 1142. Nonetheless, *Dewan*'s discussion of the elements of the administrative exemption remains good law and is instructive here where the jobs performed by both sets of plaintiffs share certain similarities.

No. 20-20213

to the mud as it is being used in drilling wells to ensure that its properties stay within the specifications set forth in the mud plan."[51] In so doing, we placed mud engineers' quality responsibilities closer to "production" on the production-administration spectrum. As the decision's very next line states, "work that is primarily functional rather than conceptual does not meet the standard"[52] for work related to management or business operations.

Like *Dewan*'s mud engineers, field engineers' rudimentary fluid-quality assessments are functional, not conceptual, work, and the quality concerns it addresses relate more closely to the production of images than to business administration. "The distinction between production and administration can be elusive, particularly where the business is providing a professional service instead of a concrete product."[53] EVO's business might fairly be characterized as a mixed scenario in which the company offers downhole video services that produce a final product in the form of an annotated video. Field engineers' work is production related in that they provide EVO's service and compile the final video product through their filming and annotating.[54]

Now, *Dewan* addressed the standalone administrative exception, while *Zannikos* dealt specifically with the HCE exemption, and it bears repeating that the HCE exemption requires only the regular performance of

---

[51] *Dewan*, 858 F.3d at 337.

[52] *Id.* at 338 (cleaned up).

[53] *Id.* at 336 ("Indeed, [t]he line between administrative and production jobs is not a clear one, particularly given that the item being produced . . . is often an intangible service rather than a material good." (alteration in original) (internal quotations and citation omitted)).

[54] *Cf. Dewan*, 858 F.3d at 337 ("Supplying the drilling-fluid systems seems more related to producing the commodities than the administering of M-I's business.").

No. 20-20213

a single administratively exempt duty. But even with those caveats, it is not evident that field engineers performed exempt quality control duties based on their practice of dropping a coin in a water bottle. EVO had the burden of showing an exempt duty by a preponderance of the evidence, and yet it points only to the testimony of White and Neill, evidence which hardly creates the "definite and firm conviction" that the district court was mistaken when it found that Plaintiffs' duties did not include quality control responsibilities.

Consequently, field engineers' duties do not satisfy either prong of the administrative exemption. Because administrative duties are EVO's only basis for claiming the HCE exemption, the failure to show either type of administrative responsibility means EVO has also failed to show that Plaintiffs are covered by the HCE exemption.[55]

### B. Exemption for Administrative Employees

For similar reasons, EVO cannot prevail on its more ambitious theory that each Plaintiff is exempt as an administrative employee under 29 C.F.R. § 541.200. To qualify for this exemption, EVO had the burden of showing that Plaintiffs' *primary* duty was "office or non-manual work directly related to the management or general business operations" and entailed "the exercise of discretion and independent judgment with respect to matters of significance."[56] As explained above, evidence regarding field engineers' duties did not establish either element. Even if field engineers provided some guidance on what they were seeing in the well, for purposes of the administrative exemption, "the focus is not on a general concept of advice or

---

[55] Because we hold that Plaintiffs' did not perform exempt administrative duties, we need not address the parties' arguments on the third prong of the HCE exemption test—whether Plaintiffs' primary duty includes non-manual work.

[56] 29 C.F.R. § 541.200(a)(2)-(3).

consultancy but rather on policy determinations for how a business should be run or run more efficiently."[57] EVO cites no examples of field engineers discharging this sort of responsibility. Thus, the district court committed no error when it determined that the administrative exemption did not apply.

## C. Evidence of Plaintiffs' Unpaid Overtime Wages

EVO argues the district court erred when it determined that Plaintiffs evidence was adequate to create a reasonable inference regarding the number of overtime hours they worked. The district court held that Plaintiffs' time records and trial testimony provided an "adequate baseline for the Court to make a just and reasonable inference as to the amount" of overtime hours, though it previously expressed doubts about the sufficiency of the evidence. EVO maintains this was mistaken because Plaintiffs' timesheets had no relation to the actual hours Plaintiffs worked and thus, they were incapable of creating the necessary reasonable inference. We disagree.

"The calculation of unpaid overtime is a mixed question of law and fact—the number of overtime hours is a finding of fact, but the methodology used to calculate back wages based on that number is a question of law," and we will reverse "only if the findings are based on a clearly erroneous view of the facts or a misunderstanding of the law."[58]

The problem here stems from EVO's failure to keep accurate time records for Plaintiffs, likely because it assumed field engineers were exempt. During Plaintiffs' tenures, EVO instructed field engineers "to write the same number of hours on their time sheets regardless of whether they worked more or less than those hours on a given day. The instructions were to record

---

[57] *Dewan*, 858 F.3d at 337.

[58] *U.S. Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436, 441 (5th Cir. 2021).

No. 20-20213

twelve hours for days on a job site and eight hours for days in the shop."[59] Supposedly, this practice was phased out and more accurate time sheets were required for field engineers after Arthur White replaced Troy Sutherlin in 2016. Regardless, the inaccurate records made it more challenging for Plaintiffs to prove their damages at trial.

The basic issue here is one that frequently arises in FLSA lawsuits: how to calculate damages fairly when precise accuracy is not practicable because an employer's time records are inaccurate, incomplete, or both. "Seventy-five years ago in *Anderson v. Mt. Clemens Pottery Company*, the Supreme Court fashioned a burden-shifting framework for federal wage claims where an employer fails to maintain proper records."[60] Where, as here, the employer's records do not allow for an accurate calculation of overtime hours, "a plaintiff need only show by 'just and reasonable inference' that she was an employee, worked the hours, and wasn't paid."[61] We assess employees' evidence under "a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable."[62] This

---

[59] *Hobbs*, 394 F. Supp. 3d at 727.

[60] *Five Star Automatic Fire Prot.*, 987 F.3d at 439–40.

[61] *Id.* at 440 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) ("[W]hen employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making the burden of proving uncompensated work an impossible hurdle for the employee." (second and third alterations in original) (internal quotation marks and citation omitted)).

[62] *Five Star Automatic Fire Prot.*, 987 F.3d at 440.

leniency has led us to accept estimates of weekly overtime hours derived from plaintiffs' testimony as adequate evidence of damages.[63]

From this we conclude the district court's basic approach was sound; EVO created the problem of proof, and so, EVO must bear some of the resulting uncertainty. Given the impossibility of proving the exact number of overtime hours, the question is whether the evidence here adequately estimated them.[64] EVO contends that there was no relation between the time sheets and Plaintiffs' actual hours. Yet field engineers testified that the hours aggregated from their time sheets were generally accurate reflections of their actual hours, and no one disputes that the time sheets accurately reflect whether Plaintiffs spent the day in question working on a jobsite or in the shop. Hence, there is at least some relation between the two. Moreover, as confirmed during oral argument, EVO considered these same time records sufficiently accurate for the purpose of billing its clients. Thus, a reasonable inference is available that the time entries reflected at least a reasonable approximation of the time that Plaintiffs would spend working in either setting. The record further indicates that from 2016 onward, field engineers' time keeping became more accurate, and thus later records were more reliable; the district court singled out Jones's records as generally

---

[63] *See, e.g.*, *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986) ("The total damage award of approximately $74,500 was derived by applying the agreed hourly rate for each employee to the estimated amount of covered overtime worked by each during the three-year period. Testimony at trial varied concerning the amount of overtime worked by the plaintiffs, partly because precise records of hours worked were unavailable. Under such circumstances the court correctly stated that the employee need only produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.").

[64] *Five Star Automatic Fire Prot.*, 987 F.3d at 445–46 ("Five Star mainly contests that the damages award was an approximated number. But that's what *Mt. Clemens* allows when, as here, FLSA-required time records are incomplete.").

trustworthy, noting that "he started keeping a record of the actual time he spent working."

EVO's brief catalogues several instances at trial where Plaintiffs admitted that a particular entry was inaccurate or that more hours were recorded than they could possibly have worked. We note that the district court reduced the number of hours claimed by each Plaintiff based on errors that EVO brought to its attention. Finally, EVO points to other ways—not raised in its damages brief to the district court—Plaintiffs might have used to make their estimates more accurate.[65] Because our precedent allows the district court to rely on a record-based estimate, and because EVO did not raise these possible refinements below, we see no basis for reversing the damages award.

### D. The Fluctuating-Workweek Standard

Plaintiffs contend that the district court erred when it calculated their overtime pay using the Fluctuating Workweek (FWW)'s half-time (.5) multiplier, rather than the usual time-and-a-half rate. Before replacing the typical 1.5 multiplier with the FWW's .5, a court must ensure that four criteria are met:

(1) the employee's hours must fluctuate from week to week;

(2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums);

(3) the fixed amount must provide compensation every week at a regular rate at least equal to the minimum wage; and

---

[65] EVO posits that Plaintiffs might have used their own records and/or any available job logs to construct a more precise estimate of their weekly overtime hours.

No. 20-20213

(4) the employer and employee must share a clear mutual understanding that the employer will pay the fixed salary regardless of the number of hours worked.[66]

The parties do not contest the first and third elements. On the fourth element, the district court found that that the preponderance of the evidence indicated that the parties had a mutual understanding that Plaintiffs would be paid a fixed salary that would cover all hours worked, and it discounted Plaintiffs' testimony to the contrary as not credible. Plaintiffs disagree with this credibility assessment but offer nothing from the record compelling us to adopt a conclusion different from the district court.[67]

This leaves the question of whether Plaintiffs' earnings varied with the number of hours worked. We have held that when an employee receives additional compensation, such as a bonus or incentive pay, that is time-based, the employee does not receive a fixed weekly salary, and the FWW method's halftime multiplier is inapplicable.[68] So, the question is whether EVO's field bonuses were time-based.

The district court concluded that there was no time-element in the field bonuses because they were tied to the job ticket amount, not directly to the hours worked. The record supports the relationship between bonuses and

---

[66] *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 924 (5th Cir. 2018), *as amended on denial of reh'g and reh'g en banc* (Feb. 1, 2019); *see also* 29 C.F.R. § 778.114(a).

[67] *Fraser*, 954 F.3d at 745 ("Giving greater weight to certain testimony 'can virtually never be clear error' because 'only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" (citation omitted)).

[68] *Dacar*, 914 F.3d at 925-26 (discussing *O'Brien v. Town of Agawam*, 350 F.3d 279, 288 (1st Cir. 2003)).

the amount of the job ticket, but the district court gave short shrift to the fact that the job tickets include time-based components, such as a charge for "Operations with additional Hrs." Although this creates a possibility that earnings varied with hours, on this record, we conclude that there was no error in the holding that field bonuses did not fluctuate with hours worked. As already noted, Plaintiffs tended to record a set twelve-hour workday when in the field, indicating that slightly more or less time spent on any given job did not affect the ticket amount. To the extent Plaintiffs' time entries both varied and did so enough to affect the job ticket amount, Plaintiffs have not pointed to evidence of this. The fact that Plaintiffs' earnings fluctuated from week to week proves nothing absent evidence that the change in hours caused the variation. Thus, the district court was correct that Plaintiffs' argument their bonuses were hours-based was "not supported by the evidence."

### E. Attorney's Fee Award

The parties have competing theories of how the district court abused its discretion with respect to attorney's fees. Plaintiffs contend the abuse was the district court's decision to reduce counsel's hourly rate from $450 to $400 based on its assessment that counsel had pursued essentially meritless theories of class certification and time-and-a-half compensation. EVO, by contrast, contends the abuse lies in the district court's failure to reduce the fee award more drastically based on what EVO characterizes as Plaintiffs' "minimal" success in the litigation and the putative disproportionality between Plaintiffs' recovery and counsel's fee award. Neither argument warrants reversal.

"An attorney's fee award rests within the sound discretion of the district court, and accordingly," we "will not reverse an award of attorneys' fees unless the trial court abused its discretion or based its award on clearly

erroneous findings of fact."[69] Courts in this circuit use the lodestar method in which "the number of hours reasonably expended" is "multiplied by the prevailing hourly rate in the community for similar work."[70] The lodestar amount is presumed reasonable, though the district court may depart upward or downward from this amount based on its consideration of the twelve *Johnson* factors.[71]

Here, the district court began by finding that a reasonable local rate for counsel's legal services was $450. The court then credited certain specific objections EVO made to the hours submitted by Plaintiffs' counsel and reduced the total from 699.1 hours to 601.47 hours, cutting some hours spent "pursuing claims that clearly had no real hope of success." Next, the district court considered the *Johnson* factors. It explained that three— "preclusion of other employment," "customary fees," and "the nature of the fee agreement" (contingent)—were incorporated into its assessment of the appropriate hourly rate. The district court determined that most of the remaining factors warranted no departure, but it singled out "*Johnson* factor eight (amounts involved and the results achieved)" as "requir[ing] an adjustment downward." The district court found that counsel's insistence on class certification and the time-and-a-half multiplier were unwarranted positions, which "overly complicated the case and, in all likelihood, prolonged it as well." For this reason, the district reduced the hourly rate from $450 to $400. The court additionally denied counsel fees for post-trial motions, finding that much of the work involved had been necessitated by counsel's "moving target as to the fees being requested."

---

[69] *Combs v. City of Huntington*, 829 F.3d 388, 391 (5th Cir. 2016) (citation omitted).

[70] *Id.* at 392.

[71] *Id.*

No. 20-20213

The district court's order belies EVO's contention that "the district court did not reduce the fee award *whatsoever* based on the low degree of success obtained." EVO fails to acknowledge that in reducing the hourly rate based on counsel's failed multiplier argument, the district court accounted for the fact that Plaintiffs recovered less than they sought. EVO also ignores the district court's explanation for reducing counsel's compensable time, which stated that the court cut certain hours for "pursuing claims that clearly had no real hope of success" and even some hours on meritorious claims, which the court deemed "excessive." EVO's argument is simply that the fees were not reduced enough because they were "one-third more than" Plaintiffs obtained in damages. This is insufficient to demonstrate an abuse of discretion.

Although "the most critical factor in determining an attorney's fee award is the degree of success obtained, . . . a low damages award alone . . . should not lead the court to reduce a fee award."[72] Moreover, this Court "ha[s] consistently emphasized that 'there is no *per se* requirement of proportionality in an award of attorney fees.'"[73] In *Gurule*, for instance, we upheld an award that "was *thirty-three* times [plaintiff's] net recovery," because it was evident that the district court "considered the relationship between the amount of the fee awarded and the results obtained."[74] The same appears true here. The district court's order on attorney's fees expressly addressed the degree of success, first by incorporating it into the

---

[72] *Gurule v. Land Guardian, Inc.*, 912 F.3d 252, 257–58 (5th Cir. 2018).

[73] *Combs*, 829 F.3d at 396 (quoting *Branch-Hines v. Hebert*, 939 F.2d 1311, 1322 (5th Cir. 1991)).

[74] *Gurule*, 912 F.3d at 259.

original rate determination and then by further reducing the hourly rate and cutting the compensable hours.

Despite the more limited halftime damages recovery, Plaintiffs prevailed on their central theory of liability. The district court's general assessment of Plaintiffs' counsel was positive, noting that "Plaintiffs' counsel performed professionally and effectively" throughout the case. We decline to infer an abuse of discretion "merely because the court did not reduce fees further," especially when we have tolerated far greater divergence between fees and damages than the disparity here.

Plaintiffs' theory of abuse fails with their argument against the FWW method. Because we find no error in the district court's rejection of Plaintiffs' argument for the time-and-a-half overtime wage, we see no abuse of discretion in the downward adjustment based partially on Plaintiffs' pursuit of the larger damages multiplier. Moreover, Plaintiffs make no effort to defend counsel's pursuit of class certification, so we are unable to conclude that the reduction in fees, premised partially on that pursuit, was an abuse of discretion.

## III.

The district court's post-trial rulings on liability, damages, and attorney's fees are AFFIRMED.