# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 14, 2025

Lyle W. Cayce
Clerk

No. 22-50257

John Gilchrist; Byron Brockman,

*Plaintiffs—Appellees*,

*versus*

Schlumberger Technology Corporation,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:16-CV-8

Before Jones, Richman, and Ho, *Circuit Judges*.

Per Curiam:

John Gilchrist and Byron Brockman sued their former employer, Schlumberger Technology Corp., for failure to pay them overtime in violation of the Fair Labor Standards Act (FLSA). We hold that Gilchrist and Brockman qualify as highly compensated employees exempt from the Fair Labor Standards Act's (FLSA's) overtime pay requirement because they performed administrative duties. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.601(a). We therefore REVERSE and REMAND the judgment with instructions to dismiss.

No. 22-50257

## I. Background

Schlumberger Technology Corp. (Schlumberger) provides oilfield services to clients engaged in the exploration and development of oil and natural gas. Its clients "are oil exploration and development companies who operate oil rigs and well sites and their general business is the drilling of wells." Gilchrist and Brockman worked for Schlumberger as Measurements While Drilling Field Specialists (MWDs). MWDs give Schlumberger clients "'downhole' information such as drilling trajectory, pressure, and temperature," which the clients use "to determine how to continue drilling and how to best produce hydrocarbons."

MWDs are essential because the data they provide ensures that the directional driller steers the well on the correct path. The potential negative consequences of a mistake by a MWD include loss of productive time, drilling outside the lease, or even a well collision, which could lead to an explosion. If an issue regarding the data or directionality arises, the MWD is "[g]enerally" the first person to identify that issue by calling attention to something in the data log that looks unusual. Thus, the MWD is "providing the client and the directional driller with real-time information without a second layer of review . . . [m]ost of the time" and is "responsible for making real-time decisions that are critical to the drilling operations." However, the MWD rarely interacts with the client directly; Gilchrist testified that he "didn't have much involvement with the company man on location, if at all," the company man being the client's representative on the rig.

When Gilchrist and Brockman worked for Schlumberger, they commenced work at a well site by "rigging up" their equipment, including the computers in their trailer and the cables connecting the computers to the oil rig used to drill wells. After rigging up, Gilchrist and Brockman generally stayed in their trailer and monitored the data that came from the tools hooked

up to the rig.  Though the MWDs rigged up their equipment, the driller and rig crew (non-Schlumberger employees) actually controlled the movement of the MWD tools as part of operating the rig.

The collected data are decoded with computer software, which determines whether the data fall within the "field acceptance criteria" and displays the corresponding data as green or red accordingly.  If the survey came in as green, the MWD "would accept it and . . . share that information with the directional driller," who would determine "based off of the well plan on his own computer whether or not he needed to make adjustments to the well itself."  If the data came in red, the MWD alerted the directional driller and then ran the survey again.  Rerunning the survey required contacting the driller on the rig floor and instructing him to repeat the survey process because the driller "operat[ed] all the controls himself."

Gilchrist and Brockman took between fifteen and fifty surveys per hour for each of their twelve-hour shifts, and they would also continuously monitor gamma logs and other rig data during that time.  Brockman testified that he performed quality control of the surveys "by double-checking the information from the tools against the well plan and expected inclination and azimuth of the client . . . as the client was drilling."  He explained that this quality control entailed double-checking that the data "makes the qualifiers, make sure it turns green" and also that the drill string remains "still."

At the end of the job but before sending final surveys to the client, the MWD and the directional driller would conduct "kind of like a QC [quality check]" wherein the MWD would "run [their data] through an Excel file, make sure all the numbers match" for various data points.  The MWD would then "gather up all the logs and make sure the well name, everything is in place, then [he] sent it off for QC" at Schlumberger's office.  However, "[i]n most cases" the lead MWD—which was Brockman's role—was responsible

for ensuring that those reports were complete and accurate before they were sent off for additional quality control. That process involved "remov[ing]" any "erroneous data point[s]" from the data before transmission. In essence, it was the MWDs' "responsibility" to "pass along quality data." After the office approved the data, the MWDs themselves sent the data to the client. Then, once the well "reached it's [sic] total depth," the MWDs "rig[ged] down," running a final survey and packing up their tools.

The year after their tenures at Schlumberger ended, Gilchrist and Brockman sued the company, arguing that they were not exempt from the FLSA provisions requiring overtime pay. Both men earned well over $200,000 annually, but neither former employee was paid any overtime while employed as an MWD. After a bench trial but before the district court rendered its decision, the identity of two potentially relevant witnesses whom Schlumberger had failed to identify came out in a related case, and Gilchrist and Brockman moved to reopen the evidence. This court ultimately determined that the witnesses' testimony was privileged, and the district court denied plaintiffs' motion. *In re Schlumberger Tech. Corp.*, 818 F. App'x at 307-08. The district court then determined that Schlumberger failed to prove that Gilchrist and Brockman were exempt under the various FLSA exemptions urged at trial, including, as relevant to this appeal, the Highly Compensated Employee (HCE) exemption. Schlumberger timely appealed the district court's decision awarding Gilchrist and Brockman overtime pay.

## II. Discussion

The FLSA's overtime provision "requires an employer to compensate any covered employee who works in excess of 40 hours in a workweek 'at a rate not less than one and one-half times the [employee's] regular rate.'" *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 333-34 (5th Cir. 2017) (quoting 29 U.S.C. § 207(a)(1)). In this case, the employer asserts that the

plaintiffs were exempt from FLSA's overtime requirements. "With respect to the underlying facts, the employer has the burden of establishing that an exemption applies by a preponderance of the evidence." *Fraser v. Patrick O'Connor & Assocs., L.P.*, 954 F.3d 742, 745 (5th Cir. 2020) (citing *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013)). "Whether an employee is within an exemption is a question of law, but how an employee spends his working time" and "[i]nferences about the nature of an employee's work" are all treated as questions of fact. *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 684 (5th Cir. 2020). We review the district court's findings after a bench trial for clear error and its conclusions of law de novo. *Hobbs v. EVO Inc.*, 7 F.4th 241, 247 (5th Cir. 2021).

On appeal, Schlumberger urges only the application of the HCE exemption, which constitutes a subset of the broader statutory exemption for those working "in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). The HCE exemption provides:

> An employee is exempt under the highly compensated category if he or she (1) is annually compensated at least [the amount specified in the regulation]; (2) 'customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative[,] or professional employee'; and (3) has within his or her primary duties the performing of office or non-manual work. *Smith*, 956 F.3d at 684 (quoting 29 C.F.R. § 541.601(a); § 541.601(d)).

The parties agree that Gilchrist and Brockman were annually compensated more than the amount required by the regulation, which was at least $100,000 during their employment by Schlumberger, and they performed primarily non-manual work. *See* 29 C.F.R. § 541.601 (2014); 29 C.F.R. § 541.601 (2015). The only outstanding element on appeal is whether they customarily and regularly performed any of the exempt duties of an administrative or executive employee.

Under the standalone administrative exemption, highlighted by Schlumberger, employees cannot qualify as bona fide administrators unless (1) their "'primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,' and [(2)] the 'primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.'" *Smith*, 956 F.3d at 684 (quoting 29 C.F.R. § 541.200(a)). But under the HCE exemption, "higher-income employees need 'regularly perform[]' only 'one' of those [administrative or executive] 'responsibilities' to so qualify." *Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 58,  143 S. Ct. 677, 690 (2023) (quoting 29 C.F.R. § 541.601(a)). This "more flexible duties standard" thus "eases the way to executive status, and so to exemption from the FLSA." *Id.* (quoting 69 Fed. Reg. 22174 (Apr. 23, 2004)).  Although the HCE exemption and the standalone exemptions "are distinguishable in key respects, we draw from our standalone-exemption precedents where the exemptions overlap." *Smith*, 956 F.3d at 686.

Further pertinent to the HCE exemption is that an employee performs a task "customarily and regularly" if the frequency of that performance is "greater than occasional," though it need not be constant. *Id.* at 688 (quoting 29 C.F.R. § 541.701).  "[W]ork normally and recurrently performed every workweek" qualifies, while "isolated or one-time tasks" do not.  *Id.*  "The applicable regulation states that the 'high level of compensation' that the HCE exemption requires is itself 'a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.'"  *Id.* at 684 (quoting 29 C.F.R. § 541.601(c)).

No. 22-50257

In *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 138 S. Ct. 1134 (2018), "[t]he Supreme Court . . . clarified that courts are to give FLSA exemptions 'a fair reading,' as opposed to the narrow interpretation previously espoused by this and other circuits." *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018) (quoting *Encino*, 584 U.S. at 89, 138 S. Ct. at 1142); *see also Hobbs*, 7 F.4th at 248 ("We give FLSA exceptions a 'fair reading' [citing *Encino Motorcars*], not a narrow one"). Schlumberger argues that the pre-*Encino* cases in our circuit are therefore not relevant. But certain post-*Encino* cases have relied on pre-*Encino* precedent,[1] and this court has explicitly stated that the value of those cases "remain[s] unaffected" by *Encino*.[2]

Schlumberger asserts that the district court erred in three ways. First, the court clearly erred in finding that Gilchrist and Brockman "did not perform any work directly related to the general business operations of [Schlumberger] or its customers" and thus did not perform any administrative duties. Second, it erred in finding that Gilchrist and Brockman did not customarily and regularly perform at least one of six other

---

[1] *See Hobbs v. EVO Inc.*, 7 F.4th 241, 254-55, 254 n.50 (5th Cir. 2021) (citing *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 337-38 (5th Cir. 2017)) (stating that, despite *Dewan*'s preceding *Encino*, "*Dewan*'s discussion of the elements of the administrative exemption remains good law and is instructive here where the jobs performed by both sets of plaintiffs share certain similarities"); *see also White v. U.S. Corr., L.L.C.*, 996 F.3d 302, 307-08 (5th Cir. 2021) (first citing *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016); and then citing *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 472 (5th Cir. 2010), *abrogated in part by Encino*, 584 U.S. at 89, 138 S. Ct. at 1142).

[2] *Kelley v. Alpine Site Servs., Inc.*, 110 F.4th 812, 816 & n.1 (5th Cir. 2024) (citing *Songer*, 618 F.3d at 475-76, and stating that "the central analyses of the[] . . . decisions [abrogated by *Encino*] remain unaffected because they concern the interpretation and application of FLSA-implementing regulations, not the statute itself" (quoting *Amaya v. NOYPI Movers, L.L.C.*, 741 F. App'x 203, 205 n.2 (5th Cir. 2018) (per curiam) (unpublished))).

No. 22-50257

management tasks relevant to executive duties.  Finally, the employer argues that the district court mistakenly used the independent judgment and discretion requirement from the standalone administrative exemption in analyzing and applying the HCE exemption.

## A. The HCE Exemption

We first consider whether the district court erred in finding that Gilchrist and Brockman "did not perform any work directly related to the general business operations of [Schlumberger] or its customers" and thus did not perform any administrative duties.

To qualify for the HCE exemption based on administrative duties, the MWDs "must have performed 'any one or more of the exempt duties or responsibilities of an . . . administrative . . . employee.'"  *Smith*, 956 F.3d at 685 (quoting 29 C.F.R. § 541.601(c)).  "Section 541.200 lays out two types of exempt duties," which are "'the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,' and duties involving 'the exercise of discretion and independent judgment with respect to matters of significance.'"  *Id.* (quoting 29 C.F.R. § 541.200(a)(2)-(3)).

"[T]he regulations define work 'directly related to [the] management or general business operations' as a type of work in which the employee 'perform[s] work directly related to assisting with the running or servicing of the business.'"  *Id.* at 685 (quoting 29 C.F.R. § 541.201(a)).  The regulations then draw a contrast between work "assisting with the running or servicing of the business" and "production-focused work."  *Id.* at 686.  Examples of production-focused work include "working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  In distinguishing between production work and management work, "the relevant distinction 'is between those employees whose primary

duty is administering the business affairs of the enterprise [and] those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.'" *Dewan*, 858 F.3d at 336 (quoting *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990)). Schlumberger contends that the MWDs performed two separate administrative duties: (1) quality control and (2) advising and consulting with Schlumberger's clients regarding drilling operations.

### 1. Quality Control Duties

"Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as . . . quality control . . . ." *Smith*, 956 F.3d at 686 (quoting 29 C.F.R. § 541.201(b)) (emphasis omitted). We hold that the district court erred in finding that the MWDs did not perform the administrative duty of quality control.

The district court explained that "[t]here is a distinction between quality-control work related to 'production' and quality-control work related to 'administration'" such that "[i]f a quality-control duty is 'functional, not conceptional' [sic] and 'relate[s] more closely to [] production . . . than to business administration,' the FLSA exemption cannot apply." The district court then determined that Gilchrist's and Brockman's "duties of reviewing surveys and monitoring logs are 'functional, not conceptual' because they largely relate to whether the directional driller can safely continue drilling along the well path." The district court analogized to this court's decision in *Hobbs* and to the inspection example in 29 C.F.R. § 541.203(g) to support its conclusion. 7 F.4th at 241. Neither analogy is persuasive.

In *Hobbs*, the plaintiff-employees did not perform duties directly related to management or general business operations because dropping a coin in a bottle to test water quality did not constitute quality control. 7 F.4th at 253, 255. The employees were field engineers whose employer supplied

"downhole video camera services to clients in the oil and gas industry" for the purpose of "identify[ing] and diagnos[ing] issues that interrupt a well's productivity." *Id.* at 245. At the start of a job, the field engineers would test well water by dropping a coin in a bottle of the water to assess the probable quality of the images to be obtained. *Id.* *Hobbs* described these tests as "rudimentary fluid-quality assessments" that constituted "functional, not conceptual, work, and the quality concerns [their work] addresse[d] relate[d] more closely to the production of images than to business administration." *Id.* at 255. Because such production-related work did not "directly relate to assisting with the running of the company," we held it was not directly related to management or general business operations. *Id.* at 253, 255.

Comparing the MWD function to dropping a coin in a bottle of water oversimplifies the MWDs' work. Brockman agreed on cross-examination that he performed quality control of the surveys "by double-checking the information from the tools against the well plan and expected inclination and azimuth of the client . . . as the client was drilling." He clarified on redirect examination that this entailed double-checking that the data "makes the qualifiers, make sure it turns green" and also that the drill string remains "still." But Brockman's and Gilchrist's other testimony shows that their assessment went beyond merely noting the color of the data and the movement of the drill string.

Before sending final surveys to the client, the MWD and the directional driller would conduct "kind of like a QC [quality check]" wherein the MWD would "run [their data] through an Excel file, make sure all the numbers match" for various data points. The MWD would then "gather up all the logs and make sure the well name, everything is in place, then [he] sent it off for QC." The MWDs would also collect gamma ray data and generate logs of those data with every survey, which they would then send out. The data were supposed to be accurate, so that process involved "remov[ing]"

any "erroneous data point[s]" from the data before transmitting the report. In essence, it was their "responsibility" to "pass along quality data." Additionally, even though the directional driller and a manager or the remote operations center would also review any data, "[i]n most cases" it was the "expectation" that Brockman as lead MWD would ensure that the various drilling reports "were completed and completed accurately" "before [the directional driller] looked at [them]."

The wealth and variety of data that the MWDs were collecting and reviewing went far beyond the rudimentary test conducted in *Hobbs*. The district court, however, largely overlooked the MWDs' work with the data logs. It merely mentioned that Gilchrist and Brockman "monitored a continuous information log that displayed downhole data on pressure, temperature, vibrations, radioactive activity, and other parameters," and at the end of a job, they "gathered" the information, "sent various reports to the Operations Support Center for final review, and then compiled the information for a final end-of-well information packet for Schlumberger's client." The district court did not acknowledge the MWDs' role in quality checking the data before sending it to the client, but that task easily fits into this court's past understanding of quality control.

Apart from rejecting a quality control argument in *Hobbs*, this court has not elaborated extensively on what quality control entails beyond observing that it appears in a list referencing other functional areas like "'tax; finance; accounting; budgeting; auditing; insurance; . . . purchasing; procurement;' and others.'" *Dewan*, 858 F.3d at 337 (quoting 29 C.F.R. § 541.201(b)). Considering those listed areas, the court in *Dewan* surmised that as to mud engineers in the oil field, "'quality control' . . . seem[ed] to mean the quality of the mud being provided to [the defendant-employer's] customers" rather than "monitoring and adding materials to the mud as it is being used in drilling wells to ensure that its properties stay within the

specifications set forth in the mud plan developed by project engineers." *Id.* Here, Gilchrist testified, in agreement with Schlumberger's Product and Media Delivery Standards, that data output is the "product that [the MWD] would be providing to [the client]." Just as quality control for mud engineers according to *Dewan* would mean controlling the quality of the mud provided to customers, quality control here means controlling the quality of the data provided to clients. Gilchrist's and Brockman's testimony shows that they did just that.

The district court also relied on an example in the regulations for its quality control conclusion. The district court compared the MWDs' "tasks of reviewing and monitoring surveys and logs" to "inspection work using 'well-established techniques and procedures' and 'techniques and skills acquired by special training or experience.'" 29 C.F.R. § 541.203(g). Because that example in the regulations does not qualify as an administrative duty, the district court reasoned, the MWDs' inspection work could not qualify.

The court's comparison was improper. As the district court noted, the standalone administrative exemption sets a "higher bar" than the HCE exemption, and this court recognizes it as a "more ambitious theory" for exemption from the FLSA overtime pay requirement. *Hobbs*, 7 F.4th at 256. This increased difficulty is due to both the conjunctive nature of the administrative exemption test and the requirement that an employer prove that the task at issue was the employee's "primary duty," and not merely something the employee did "customarily and regularly." *Hobbs*, 7 F.4th at 256; *Smith*, 956 F.3d at 685 ("While the elements [of the exemptions] are conjunctive in the standalone exemptions, they are disjunctive when paired with a high salary.").

The examples in § 541.203(g) are geared to this higher bar because they illustrate the standalone administrative exemption. Albeit in an unpublished, nonprecedential decision, this court acknowledged the discrepancy between the standards for these administrative examples and the standards for the HCE exemption. *Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349 (5th Cir. 2015) (per curiam). There, we held that oil inspectors' duties did not satisfy the administrative exemption by reference to § 541.203(g)'s examples, they did satisfy the HCE exemption because the employees "primarily performed non-manual work related to the general or business operations" of their employer's customers. *Id.* at 360. The fact that the MWDs' duties did not rise to the level of an example in § 541.203(g) does not necessarily foreclose the HCE exemption. Neither the analogy to *Hobbs* nor the inspection work example provides a basis for refuting Schlumberger's evidence that the MWDs performed quality control duties.

Additionally, the MWDs "customarily and regularly" performed quality control functions because they constantly monitored the well data throughout their twelve-hour shifts, quality checked the survey data for each of the fifteen to fifty surveys that they took every hour, and reviewed and edited data at the end of every job. This consistency establishes that the MWDs performed these tasks "normally and recurrently . . . every workweek," a frequency that is certainly "greater than occasional," as required by the regulations. 29 C.F.R. § 541.701.

In summary, the district court overlooked the MWDs' role in quality checking data logs and improperly relied on *Hobbs* and the inspection example in regulation § 541.203(g). Accordingly, the district court erred in determining that the MWDs did not perform the administrative duty of quality control.

No. 22-50257

## 2. Advisory and Consulting Duties

"'[E]mployees acting as advisers or consultants to their employer's clients or customers' qualify for the administrative exempt standard" because they perform "work directly related to the management or general business operations of the employer's customers." *Venable v. Smith Int'l, Inc.*, 117 F.4th 295, 301 (5th Cir. 2024) (quoting 29 C.F.R. § 541.201). Following *Venable*, we hold, contrary to the district court, that the MWDs acted as advisers to Schlumberger's clients.

In *Venable*, the plaintiff-employees' work was deemed "directly relate[d] to the general business operations of [their employer's] customers" because they advised their employers' clients by "supervising the use of drilling tools" and "assisting . . . [in] the appropriate method of conducting drilling operations." *Id.* at 301. The employees were DTR Field Specialists, also known as "reamers" who supervised oil exploration companies' use of their employer's underreaming tool on offshore drilling rigs. *Id.* at 298. As part of their job responsibilities, the reamers would supervise the drilling rig crew in attaching and removing the reamer tool to and from the drill string, monitor and oversee the reaming process, and offer advice and suggestions to the driller regarding how to operate the tool. *Id.* Notably, the reamers did not operate the tool themselves; rather, the drillers from the client's company operated the tool under the reamers' supervision. *Id.* Moreover, because supervising the drillers' use of the underreaming tool was the reamers' "primary job," they performed the task "regularly and customarily." *Id.* at 301. These responsibilities led the court to characterize the reamers as "advisers" to the clients and "liaisons" between the clients' drillers and the reamers' employer. *Id.*

At the time of its decision, the district court did not have the benefit of *Venable* and instead relied principally on *Dewan* for its analysis of this duty.

14

858 F.3d 331 (5th Cir. 2017).  The district court stated, "[i]n determining whether an employee fits the regulation's concept of an advisor or consultant, courts evaluate whether the employee's activities relate to 'management policies,' 'general business operations,' and 'policy determinations [for] how a business should be run.'"  The court then determined that the MWDs' "duty to monitor surveys and logs related to the drilling process, which in turn related to the client's success in extracting hydrocarbons" but "did not directly relate to the client's management policies, general business operations, or policy determinations."  While it is hardly controversial that the MWDs' tasks "related to the client's success in extracting hydrocarbons," we cannot, in light of *Venable*, accept the further legal conclusion that this duty to monitor "did not directly relate to the client's management policies, general business operations, or policy determinations."

In *Dewan*, this court held that an oilfield service company was not entitled to summary judgment on the administrative exemption from overtime pay for its mud engineers.  The court relied in part on the dissimilarity between the mud engineers' role and two examples of advisers provided in the regulations: tax experts and financial consultants.  858 F.3d at 332, 337–38.  *Dewan*, however, preceded *Encino's* directive to give the FLSA exemptions a "fair reading" rather than a narrow construction.  *Encino*, 584 U.S. at 89, 138 S. Ct. at 1142; *see Dewan*, 858 F.3d at 334 (applying "narrow construction").  Post-*Encino*, *Venable* correctly expanded our understanding of what constitutes an adviser or consultant.  We must rely on *Venable*'s interpretation in our analysis.

The MWDs' work resembles the tasks described in *Venable* because the MWDs advised Schlumberger's clients by providing them with essential information during the drilling process.  On the one hand, the MWDs appear to have given the client very little direct guidance: Gilchrist, for example,

testified that he "didn't have much involvement with the company man on location, if at all." But more importantly, just as the reamers in *Venable* advised the client's crew about how to operate the reaming tool, the MWDs' data crucially informed the client's precise drilling of the well. Their data ensured that the directional driller kept the well on its predetermined path, as mistakes by the MWD could lead to loss of productive time, drilling outside the lease, or even a well collision and potentially a catastrophic explosion. Brockman himself agreed that the MWD is "responsible for making real-time decisions that are critical to the drilling operations."

The MWDs' guidance to the rig crew in operating the MWD tool also resembles the advice in *Venable*. The reamers in *Venable* did not operate the reaming tool themselves and instead directed the client's crew in its operation. Here, the district court determined that "any 'supervision' of the rig crew was limited to giving the occasional direction or hand signal while the crew lowered the measurement tools into the well." But the rig crew controlled the movement of the MWD tools, and any re-running of a survey required asking the driller to repeat the survey process because he "operat[ed] all the controls himself." Although that was not enough to satisfy the district court's conception of "supervision," the MWDs' activity in directing the drilling crew when conducting a survey closely resembles the more remote positioning of the *Venable* reamers.

We conclude that MWDs fit comfortably in the adviser category alongside reamers on offshore drilling rigs. *Venable*, 117 F.4th at 300–01; *see also Dewan*, 858 F.3d at 337. Consequently, the MWDs acted as advisers to Schlumberger's clients and performed "work directly related to the management or general business operations of [their] employer's customers." *See* 29 C.F.R. § 541.201(c).

Moreover, the MWDs performed this duty "customarily and regularly." 29 C.F.R. § 541.201(a). The bulk of a MWD's working time is spent monitoring data from the well with the directional driller. The MWD takes between fifteen and fifty surveys an hour in a twelve-hour shift and also constantly monitors gamma logs and other data from the rig. "Most of the time" he "provid[es] the client and the directional driller with real-time information without a second layer of review," and he is "[g]enerally" the first person to identify any concerns about the data or directionality of the well. That frequency more than satisfies the standard set out in the regulations of tasks performed "normally and recurrently . . . every workweek." *Smith*, 956 F.3d at 688.

Because Schlumberger proved that the MWDs customarily and regularly performed work directly related to the management or general business operations of their customers, a qualifying exempt duty of an administrative employee, Schlumberger satisfies the duty requirement of the HCE exemption. As stated above, the parties do not dispute that the MWDs' compensation was high enough to qualify for the exemption or that they primarily performed non-manual work. Therefore, the MWDs fall within the HCE exemption from the FLSA's overtime payment requirement, and it was error for the district court to determine otherwise.

### B. Executive Duties & Independent Judgment

Schlumberger also contends that that the district court erred in determining that Gilchrist and Brockman did not customarily and regularly perform at least one of six other management tasks and thus did not perform any executive duties. Because the HCE exemption requires only that an employee perform either one administrative duty or one executive duty, and we have already determined that the MWDs performed administrative duties, we do not reach the executive duties analysis.

Similarly, we need not address the argument that the district court erred by considering the "discretion and independent judgment" prong conjunctively rather than disjunctively in its HCE duties analysis. *See* 29 C.F.R. § 541.202(e). The district court erroneously considered the MWDs' use of discretion and independent judgement as an adjunct requirement to other administrative duties, even though it expressly acknowledged that the standalone administrative exemption sets a "higher bar." But as we noted in *Smith*, "[w]hile the elements [of the executive and administrative exemptions] are conjunctive in the standalone exemptions, they are disjunctive when paired with a high salary." 956 F.3d at 685.

## III. Conclusion

For these reasons, Gilchrist and Brockman qualify as highly compensated employees and are exempt from the FLSA's overtime pay requirement. We therefore REVERSE the judgment of the district court and REMAND with instructions to dismiss.